**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ESTATE OF DANIEL HERNANDEZ, by and through successors in interest, Manuel Hernandez, Maria Hernandez and M.L.H.; MANUEL HERNANDEZ, individually; MARIA HERNANDEZ, individually, | No. 21-55994 D.C. Nos. 2:20-cv-04477-SB-KS 2:20-cv-05154-DMG-KS |

*Plaintiffs-Appellants*,

 and

M.L.H., a minor, by and through her guardian ad litem Claudia Sugey Chavez,

*Plaintiff*,

 v.

CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; TONI MCBRIDE,

*Defendants-Appellees*.

OPINION

| | |
|---|---|
| M.L.H., a minor, by and through her guardian ad litem Claudia Sugey Chavez, | No. 21-55995 |
| *Plaintiff-Appellant*, | D.C. Nos. 2:20-cv-04477-SB-KS 2:20-cv-05154-DMG-KS |
| and | |
| ESTATE OF DANIEL HERNANDEZ, by and through successors in interest, Manuel Hernandez, Maria Hernandez and M.L.H.; MANUEL HERNANDEZ, individually; MARIA HERNANDEZ, individually, | |
| *Plaintiffs*, | |
| v. | |
| CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; TONI MCBRIDE, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Stanley Blumenfeld, Jr., District Judge, Presiding

Argued and Submitted En Banc September 24, 2024
San Francisco, California

Filed June 2, 2025

Before:  Mary H. Murguia, Chief Judge, and Johnnie B. Rawlinson, Jacqueline H. Nguyen, Ryan D. Nelson, Bridget S. Bade, Daniel P. Collins, Daniel A. Bress, Patrick J. Bumatay, Holly A. Thomas, Salvador Mendoza, Jr. and Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Nguyen;
Partial Concurrence and Partial Dissent by Judge R. Nelson;
Partial Concurrence and Partial Dissent by Judge Collins;
Partial Dissent by Judge Bumatay

## SUMMARY[*]

### Excessive Force

The en banc court affirmed in part and reversed in part the district court's summary judgment for the City of Los Angeles, the Los Angeles Police Department, and Officer Toni McBride in an action alleging that McBride used excessive force when she shot Daniel Hernandez six times, the final round killing him, after he ignored her repeated commands to stop moving toward her and drop his knife.

Although the entire shooting occurred over just six seconds, McBride fired three distinct volleys of two shots, pausing after each.  She fired the final volley—shots five and

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

six—after Hernandez had collapsed on the ground and was on his back with his knees curled up to his chest, rolling away from her. The district court granted defendants summary judgment, finding that McBride did not violate Hernandez's Fourth Amendment rights and that any such violation was not clearly established. The district court further granted defendants summary judgment on plaintiffs' state law, municipal liability, and familial integrity claims.

Reversing the district court's summary judgment on the Fourth Amendment excessive force claim, the en banc court held that although, under the circumstances, McBride acted reasonably when firing the first two volleys of shots, there was a triable issue of fact as to whether continuing to fire thereafter became unreasonable. Given that Hernandez was rolling away from her and balled up in a fetal position, a jury could reasonably find that Hernandez no longer posed an immediate threat. McBride could have and should have first reassessed the situation to see whether he had been subdued. McBride was not entitled to qualified immunity because this court's decision in *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017), clearly established that continuing to shoot a suspect who appears to be incapacitated and no longer poses an immediate threat violates the Fourth Amendment. A fallen and injured suspect armed only with a bladed instrument does not present a continuing threat merely because he makes nonthreatening movements on the ground without attempting to get up.

The en banc court reversed the district court's grant of summary judgment to defendants on plaintiffs' state law claims because the district court based its ruling solely on the lack of a Fourth Amendment violation.

Finally, the en banc court agreed with and adopted the three-judge panel's discussion affirming the district court's summary judgment in favor of defendants on plaintiffs' Fourth Amendment claim for municipal liability and Fourteenth Amendment claim for violating plaintiffs' right to family integrity.

Concurring in part and dissenting in part, Judge R. Nelson, joined by Judges Bress and Bumatay, and joined by Judge Bade as to Parts I-III, IV.A and V, agreed with Judge Collins that McBride was entitled to qualified immunity. But in Judge R. Nelson's view, McBride never violated the Fourth Amendment in the first place. Contrary to the majority's conclusion, McBride's six shots over six seconds did not trigger a duty to reassess the risk Hernandez posed, particularly where he remained armed and in motion during that entire time. For similar reasons, Judge R. Nelson would affirm the district court's dismissal of the state-law claims. He agreed to affirm the district court's dismissal of plaintiffs' Fourteenth Amendment substantive due process claims because directing lethal force toward an armed and persistent threat does not shock the conscience and the record does not support the claims under this court's precedent. Given, however, that the Supreme Court has admonished courts to be wary of recognizing new substantive due process rights, this court needs to reexamine its unreasoned decisions which recognize the substantive due process rights of parents to the companionship of their adult-children and of children to the companionship of their parents.

Concurring in part, concurring in the judgment in part, and dissenting in part, Judge Collins, joined by Judges R. Nelson, Bade, Bress and Bumatay as to Part II(B), concurred in the judgment to the extent that the majority concluded that

(1) the district court erred in holding that no rational jury could find that the final volley of shots fired by McBride was unreasonable under Fourth Amendment standards; and (2) the district court erred in granting summary judgment on that basis as to certain of plaintiffs' state law claims. He concurred in Part IV(B) of the majority's opinion to the extent that it adopted the panel opinion's discussion affirming the dismissal of plaintiffs' claim of municipal liability and plaintiffs' claims under the Fourteenth Amendment. But he dissented from the majority's conclusions that McBride's final volley of shots violated clearly established law, and that McBride therefore was not entitled to qualified immunity with respect to plaintiffs' Fourth Amendment excessive force claim. *Zion* is materially distinguishable and does not establish a broad general rule that places the outcome of this case beyond debate.

Dissenting, Judge Bumatay wrote that under the totality of the circumstances, McBride didn't use excessive force in stopping an obvious threat. She had no reasonable opportunity to ensure her safety or the safety of the many civilians surrounding Hernandez in the short time. Moreover, though distinguishable from this case, the court should have taken this opportunity to overrule *Zion*.

**COUNSEL**

Erwin Chemerinsky (argued), UC Berkeley School of Law, Berkeley, California; Narine Mkrtchyan (argued), Mkrtchyan Law, Glendale, California; Arnoldo Casillas, Casillas & Associates, Long Beach, California; Denisse O. Gastelum, Gastelum Law APC, Long Beach, California; Gerald P. Peters, Law Office of Gerald Philip Peters, Thousand Oaks, California; Melanie T. Partow, Law Offices of Melanie Partow, Long Beach, California; Paul L. Hoffman, Schonbrun Seplow Harris Hoffman & Zeldes LLP, Hermosa Beach, California; for Plaintiffs-Appellants.

Kevin E. Gilbert (argued) and Carolyn Aguilar, Orbach Huff & Henderson LLP, Pleasanton, California; Colleen R. Smith and Shaun D. Jacobs, Deputy City Attorneys, Los Angeles Office of the City Attorney, Los Angeles, California; for Defendants-Appellees.

James L. Buchal, Murphy & Buchal LLP, Portland, Oregon, for Amicus Curiae The National Police Association.

Steven Art and David B. Owens, Loevy & Loevy, Chicago, Illinois; Michael J. Haddad, Haddad & Sherwin LLP, Oakland, California; John Burton, The Law Offices of John Burton, Pasadena, California; Lauren Bonds and Eliana Machefsky, National Police Accountability Project, Berkeley, California; for Amicus Curiae The National Police Accountability Project (NPAP).

Alexander A. Reinert, Benjamin N. Cardozo School of Law, New York, New York, for Amicus Curiae Professor Alexander A. Reinert.

**OPINION**

NGUYEN, Circuit Judge:

A police officer shot Daniel Hernandez six times, the final round killing him, after he ignored her repeated commands to stop moving toward her and drop his knife. Although the entire shooting occurred over just six seconds, the officer fired three distinct volleys of two shots, pausing after each. The officer fired the final volley—shots five and six—after Hernandez had collapsed on the ground. He was on his back with his knees curled up to his chest, rolling away from the officer.

Hernandez's family sued the officer, the police department, and the city, claiming that the officer used excessive force. The district court granted defendants summary judgment, finding that the officer did not violate Hernandez's Fourth Amendment rights and that any such violation was not clearly established.

We reverse the district court's Fourth Amendment rulings. It has been clearly established for more than a decade that when an officer shoots and wounds a suspect, and he falls to the ground, the officer cannot continue to shoot him, absent some indication that he presents a continuing threat, without first reassessing the need for lethal force. *See Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (holding that under "long-settled Fourth Amendment law," "the use of deadly force against a non-threatening suspect is unreasonable," including "continued force against a suspect who has been brought to the ground"). We reaffirm circuit precedent that a fallen and injured suspect armed only with a bladed instrument does not present a continuing threat merely because he makes

nonthreatening movements on the ground without attempting to get up.  *See id.*  Because the officer here continued to shoot Hernandez under such circumstances, a jury could reasonably find that she employed constitutionally excessive force.  If so, she is not entitled to qualified immunity.

## I.  Factual Background[1]

Late in the afternoon on April 22, 2020, Los Angeles Police Department ("LAPD") officers Toni McBride and Shuhei Fuchigami drove past a multi-vehicle collision on San Pedro Street near the intersection of East 32nd Street.  The uniformed officers were in a patrol SUV en route to a different incident but decided to respond to the collision instead.  As they approached from the north, Fuchigami activated the SUV's overhead lights, and McBride asked several bystanders to tell her who had been hurt.

When the officers arrived at the collision, Fuchigami parked facing traffic in the number one northbound lane, to the left and rear of a Toyota Camry stopped in the number one southbound lane.  Four vehicles had visible damage—two on the west side of the street, beyond the Camry, where a black truck facing the oncoming (southbound) traffic had collided with an RV parked at the curb, and two sedans on

---

[1] In setting forth the facts, we rely primarily on video recordings from the defendant officer's body-mounted camera, her vehicle-mounted camera, and a bystander's cell phone, because the parties do not dispute that these videos accurately portray the events at issue.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (admonishing courts to "view[] the facts in the light depicted by the videotape" when unchallenged).  Where the video recordings leave factual ambiguity, however, we follow the usual practice of drawing reasonable inferences in the light most favorable to the party opposing summary judgment—here, plaintiffs.  *See id.* at 378.

the sidewalk of the east side of the street.  At least 25 people had gathered along the sides of the street, several of whom were screaming and yelling.

As the officers exited their vehicle, the police radio broadcasted that "the suspect's vehicle is a black Chevrolet truck" and "the suspect is male, armed with a knife."  Five or six bystanders approached the officers, pointing at the black truck.  Officer Fuchigami asked: "Where is he?  Where is he at?  Is he in the truck?"  The bystanders told the officers that a "crazy guy with a knife" was in the truck, threatening to kill himself.  The officers directed the bystanders to move back, and McBride drew her service weapon—a Glock 17 handgun—to the "low-ready" position, i.e., trained on the ground between her feet and potential targets.

The Camry occupant told the officers that the man in the truck "has a knife."  McBride asked: "Why does he want to hurt himself?"  The Camry driver replied: "We don't know. He's the one who caused the accident."  McBride directed Fuchigami to call for backup.  She then ordered the Camry driver to exit her vehicle and move to the sidewalk.

McBride observed that the man in the truck—later identified as Hernandez—appeared to be rummaging around in the middle console.[2]  McBride directed several bystanders

---

[2] Plaintiff M.L.H. disputes this observation (the other plaintiffs do not) because "McBride could not have seen" into the truck based on the photos.  While the image quality makes it impossible for *us* to see the truck's interior, McBride plainly had the ability to observe Hernandez's movements through the windows—she commented on them contemporaneously.  M.L.H. does not dispute that McBride saw Hernandez's other actions inside the truck even though, as M.L.H. acknowledges, those observations also were "not supported by" the video from McBride's body-worn camera.

to clear the area.  The police radio reported that the suspect was "armed with a knife, cutting himself . . . inside his vehicle."

McBride asked Fuchigami if they had "less lethal" force options.  She was armed with pepper spray and a taser, and knew that a 40-millimeter rubber projectile launcher—an option for using less lethal force against individuals with bladed weapons—was in the patrol SUV.

Observing Hernandez climb out through the window on the far side of the truck and disappear from view, McBride called out to Fuchigami that Hernandez "might be running." She then called out to Hernandez: "Hey man, let me see your hands.  Let me see your hands, man."

After about six seconds, Hernandez emerged from behind the rear of the truck, approximately 43 feet from McBride.  He was shirtless and sweating profusely.  As he rounded the truck, Hernandez began walking in McBride's direction.  He was holding something in his right hand— McBride could not tell what—that turned out to be a box cutter.

McBride backed up 10 feet along the side of the Camry. As she did so, she gestured with her hand for Hernandez to stop and ordered: "Stay right there.  Drop the knife." Hernandez continued to advance.  McBride again ordered: "Drop the knife.  Drop the knife."

Hernandez, still approaching, raised his fully extended arms to each side at roughly a 45-degree angle.  He did not say anything.  McBride pointed her gun at him.  Hernandez took three more steps toward her, closing the distance between them to approximately 36 feet.  McBride yelled "Drop it!" and without pausing fired two rounds at him.

Hernandez fell to the ground on his right side and yelled out something.  He then rolled to the left into a position with his knees, feet, and hands on the pavement, facing down, and started to push himself up, though he did not continue walking toward McBride.

McBride again yelled at Hernandez to "drop it" and without pausing fired another two rounds.  This second volley caused him to fall onto his back and curl up into a ball with his knees against his chest and his arms wrapped around them.  As he rolled away from McBride onto his left side, she fired two more rounds.  The third volley caused Hernandez to collapse on the ground and remain down.

The entire shooting sequence lasted approximately 6.2 seconds.  Roughly 2.5 seconds elapsed between the first and second volleys and 1.4 seconds between the second and third volleys.  Other officers arrived on the scene only after McBride had begun shooting.

Hernandez died from his injuries.  The sixth shot caused an immediately fatal wound to his head.  The next most serious injury, from the fourth shot, damaged his lung and liver but may have been survivable with immediate medical treatment.

The Los Angeles Board of Police Commissioners found that McBride acted outside of the LAPD's policy on lethal force when firing the fifth and sixth rounds.  The policy permits officers to use lethal force only when necessary, based on the totality of circumstances, "[t]o defend against an imminent threat of death or serious bodily injury to the officer or another person."  The Board found that it was unreasonable to think Hernandez posed such a threat after the second volley because he "did not reposition himself

from laying on his side to being" in a position "from which he could resume an advance toward [McBride] or others."

## II.  Procedural History

Hernandez's parents[3] and minor daughter (plaintiff M.L.H.) filed separate lawsuits in which they alleged constitutional and state law violations by McBride, the LAPD, and the City of Los Angeles ("City") in connection with Hernandez's death.  Pursuant to the parties' stipulation, the district court consolidated the two suits.

Plaintiffs claim that (1) McBride used excessive force against Hernandez in violation of the Fourth Amendment; (2) the LAPD and the City had an unconstitutional custom or practice allowing officers to use firearms callously and recklessly in violation of the Fourth Amendment; (3) all defendants interfered with plaintiffs' right to familial integrity under the Fourteenth Amendment; (4) McBride and the City are liable for assault, battery, and wrongful death; and (5) all defendants violated the Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1.[4]

The district court granted summary judgment in favor of defendants on each of plaintiffs' claims.  The court concluded that McBride did not violate Hernandez's Fourth Amendment rights because her use of lethal force was reasonable under the circumstances.  Alternatively, the court ruled that McBride was entitled to qualified immunity

---

[3] Hernandez's parents sue on behalf of Hernandez's estate as well as on their own behalf.

[4] In addition, plaintiffs claimed conspiracy under 42 U.S.C. § 1985(3) and violation of the Ralph Civil Rights Act, Cal. Civ. Code § 51.7, but they did not oppose defendants' motion for summary judgment on these claims.

because the law did not clearly establish that her actions constituted constitutionally excessive force.  The court concluded that the lack of a constitutional violation foreclosed plaintiffs' municipal liability, familial integrity, and state law claims.  The court alternatively rejected plaintiffs' municipal liability claim for failure to show that a municipal custom or policy caused any constitutional violation.

A three-judge panel of this court affirmed in part, reversed in part, and remanded.  *Est. of Hernandez ex rel. Hernandez v. City of Los Angeles*, 96 F.4th 1209 (9th Cir. 2024).  The panel held that the reasonableness of McBride's final two shots was a triable issue of fact, *id.* at 1218, and therefore the district court erred in granting summary judgment on the state law claims at issue, *id.* at 1223.  However, the panel agreed with the district court that McBride did not violate clearly established law by firing the third volley of bullets and thus was entitled to qualified immunity on plaintiffs' Fourth Amendment claim.  *Id.* at 1221.  The panel also affirmed the district court's grant of summary judgment on plaintiffs' municipal liability and familial integrity claims.  *Id.* at 1222–23.  A majority of the active, non-recused judges on our court voted to rehear this case en banc.  *Est. of Hernandez ex rel. Hernandez v. City of Los Angeles*, 106 F.4th 940 (9th Cir. 2024).

## III.  Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291.  We review the district court's summary judgment rulings de novo, *see Spencer v. Pew*, 117 F.4th 1130, 1137 (9th Cir. 2024), including an officer's entitlement to qualified immunity, *see Sanderlin v. Dwyer*, 116 F.4th 905, 910 (9th Cir. 2024).

## IV.  Discussion

## A.  Fourth Amendment Claim

### 1.  There is a triable issue of fact as to whether Officer McBride violated Hernandez's Fourth Amendment rights

The Fourth Amendment's guarantee of personal security "against unreasonable . . . seizures," U.S. Const. amend. IV, applies to an officer's use of force against a suspect to restrain his movement.  *Torres v. Madrid*, 592 U.S. 306, 317–18 (2021).   The officer's purpose is determined objectively from the officer's conduct.  *See id.*  McBride's conduct—"ordering [Hernandez] to stop and then shooting to restrain [his] movement—satisfies the objective test for a seizure."  *Id.* at 318.

In determining whether the seizure comports with the Fourth Amendment, the critical question is whether the use of force was objectively reasonable.  *See Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014).  Courts must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake," *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)), considering "the totality of the circumstances," *Plumhoff*, 572 U.S. at 774.  The relevant considerations depend on the "particular situation" and the "particular type of force" used, *Scott*, 550 U.S. at 382, and may include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (per curiam) (quoting *Graham*, 490 U.S. at 396).

Although we determine reasonableness objectively, we do so "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. We must allow for an officer's need "to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," the use of deadly force is constitutionally permissible. *Garner*, 471 U.S. at 11.

At the same time, "the suspect's interest in his own life" prohibits an officer from using lethal force simply because the suspect has resisted arrest. *Id.* "Where the suspect poses no immediate threat to the officer and no threat to others," deadly force "is constitutionally unreasonable." *Id.*

**a.**

Here, as a matter of law, Officer McBride acted reasonably when firing the first four rounds at Hernandez, although the third and fourth rounds present a closer question. When she began firing, McBride had probable cause to suspect that Hernandez had caused a serious traffic collision and saw him moving toward her with a bladed weapon. While she knew Hernandez had attempted to cut himself—and thus had reason to suspect his mental instability—she also knew that his actions had likely already injured nearby motorists. And by refusing to comply with McBride's commands to stop and drop the knife, Hernandez created a heightened sense of urgency and unpredictability.

A reasonable officer in those circumstances could conclude that Hernandez posed a safety threat to the officer and the bystanders in the vicinity. In weighing the possible

danger to McBride and the public with the risk to Hernandez by firing at him, we "take into account not only the number of lives at risk, but also their relative culpability." *Scott*, 550 U.S. at 384.

Pointing to Hernandez's erratic behavior and self-harm, plaintiffs argue that McBride's response should have accounted for the likelihood that he was emotionally disturbed or under the influence of a drug such as methamphetamine or PCP. *See Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) ("[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed."). But in *Deorle*, the person "creating a disturbance or resisting arrest" was "an unarmed, emotionally distraught individual." *Id.* at 1282. We explained that "the tactics to be employed against" such a person "are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Id.* at 1282–83. Hernandez falls more closely into the latter category.

In *Deorle*, moreover, "a host of . . . officers were at the scene for over half an hour" when they "made a calculated and deliberate decision to shoot Deorle." *Id.* at 1283. *Deorle* stands for the principle that officers may not use extreme force against an emotionally disturbed individual in circumstances that are neither dangerous nor urgent without first exhausting other, less forceful means. *See Kisela*, 584 U.S. at 106–07 (distinguishing *Deorle* as "involv[ing] a police officer who shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been

'physically compliant and generally followed all the officers' instructions'; and he had been under police observation for roughly 40 minutes" (quoting *Deorle*, 272 F.3d at 1276)).   Other than Hernandez's erratic behavior, this case is factually dissimilar.   McBride had backed up several feet, and Hernandez continued walking toward her, refusing her commands to stop and drop his weapon.   While she could have continued backing up and used the rear of the Camry as cover, officers "need not avail themselves of the least intrusive means of responding to an exigent situation."  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see also Blanford v. Sacramento County*, 406 F.3d 1110, 1117–18 (9th Cir. 2005) (concluding that the officers reasonably shot a sword-bearing suspect who "refused to give up his weapon, was not surrounded, and was trying to get" into a location "where his sword could inflict injury that the deputies would not then be in a position to prevent").

Plaintiffs also argue that McBride should have waited to begin firing because Hernandez was not yet in striking distance, and she could have employed alternate means of subduing him.   In *Lal v. California*, we rejected a similar argument that officers "should have used pepper spray" or "waited for less than lethal devices to arrive" before shooting a suspect.   746 F.3d 1112, 1117 (9th Cir. 2014).   In *Lal*, as here, the officers did not have immediate access to a less lethal 40-millimeter launcher that might have been used to defuse the situation, the suspect had "previously harmed or endangered the lives of others," and the suspect was not surrounded by a multitude of officers.   *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033 (9th Cir. 2018) (distinguishing *Lal* on those "important facts").   We held that officers need not "endanger their own lives by allowing [a

suspect] to continue in his dangerous course of conduct" merely because he "was intent on 'suicide by cop.'" *Lal*, 746 F.3d at 1117.

### b.

Having concluded that McBride reasonably began shooting at Hernandez, we must determine whether at some point her continued fire might have become unreasonable. "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff*, 572 U.S. at 777; *see also Blanford*, 406 F.3d at 1118 (holding that the officer reasonably fired a second volley where "[n]othing . . . in the balance of factors already present" to justify the initial volley "had changed when [the officer] fired again").

However, it is a "different case" if the officer "initiate[s] a second round of shots after an initial round ha[s] clearly incapacitated [the suspect] and ha[s] ended any threat." *Plumhoff*, 572 U.S. at 777. "[T]erminating a threat doesn't necessarily mean terminating the suspect." *Zion*, 874 F.3d at 1076. A suspect who "is on the ground and appears wounded . . . may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting." *Id.*

After the first volley, Hernandez fell to the ground. McBride paused firing and again ordered Hernandez to drop his knife. He ignored her command and, despite being on the ground, reoriented himself in her direction and had risen halfway to a standing position when she again fired at him. While he had not yet resumed walking toward her, and he may have yelled out in pain rather than rage, he was not yet incapacitated. Thus, a reasonable officer could conclude that

he continued to present an imminent threat.  *See Blanford*, 406 F.3d at 1118.

However, a reasonable jury could find that after the second volley, the immediate threat posed by Hernandez had ended.  Indeed, the Board of Police Commissioners reached just that conclusion in finding that McBride's third volley violated department policy.  *See Garner*, 471 U.S. at 19 (explaining that "departmental policies are important" in evaluating whether force was reasonable because courts should hesitate to impose requirements that "would severely hamper effective law enforcement").  When McBride fired the third volley of shots, Hernandez was rolling away from her, balled up in a fetal position.  Viewing the video footage in the light most favorable to plaintiffs, Hernandez did not constitute an immediate threat, and McBride could have and should have first reassessed the situation to see whether he had been subdued.  *See Zion*, 874 F.3d at 1076.

Defendants characterize *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), as standing for the principle that "officers cannot reasonably be expected to immediately perceive a change in a suspect's threatening behavior when firing in rapid succession."  To the contrary, *Wilkinson* did not authorize officers to "shoot mindlessly" until the suspect was dead, but rather recognized that officers may need "to reevaluate whether a deadly threat has been eliminated after each shot" if circumstances permit.  *Id.* at 552.  The officer in *Wilkinson* complied with this requirement "by ceasing fire after he perceived that . . . the threat had been eliminated."  *Id.*  The issue was factual—the parties disputed whether the officer reasonably could have perceived that the threat had ended earlier, and we held that the officer's stated perception of an ongoing threat was "uncontradicted by any evidence in the record."  *Id.* at 551.

Here, McBride did pause—albeit briefly—after the second volley.  More importantly, she had already fired four rounds at Hernandez.  A jury could reasonably find that Hernandez no longer posed an immediate threat.[5]  He was on his back, well beyond striking distance, armed only with a melee weapon, and writhing in pain from multiple gunshot wounds.  It was not clear whether he would or even could get up from the ground to continue advancing toward McBride.  She had her handgun trained on him, with which she had already successfully knocked him down twice.  McBride had an obligation to reassess the situation before continuing her fire, and a jury could find that her failure to do so was unreasonable.  We therefore conclude that

---

[5] Judge Nelson's partial dissent erroneously concludes that 6.2 seconds is insufficient as a matter of law to make such a reassessment because Hernandez presented "an armed and moving threat."  R. Nelson Op. at 31.  An officer's "continued use of deadly force" against an armed suspect is not per se "reasonable because [the suspect] was still moving." *Zion*, 874 F.3d at 1076 (citing *Plumhoff*, 572 U.S. at 777); *see also Nehad v. Browder*, 929 F.3d 1125, 1134 (9th Cir. 2019) (holding that knife-wielding suspect who approached officer from several yards away did not necessarily present an immediate threat).  Even when, as here, an officer is initially justified in using lethal force, she cannot unnecessarily create a sense of urgency by continuing to fire after the immediate threat has ended. *See Wilkinson*, 610 F.3d at 552; *cf. Nehad*, 929 F.3d at 1134–35 (rejecting officer's reliance on having "less than five seconds" to react where the officer unnecessarily created the sense of urgency).  Were it otherwise, the officer would have perverse incentives; so long as she fired rapidly enough, no jury could consider whether the circumstances continued to call for lethal force, no matter how long the barrage or how clear the suspect's incapacitation had become.  Certainly, a duty to stop firing arises if an objectively reasonable officer would view the suspect as clearly incapacitated. *See* R. Nelson Op. at 36–37.  But whether a threat perceptibly ended is a factual determination that is ordinarily ill-suited for summary judgment. *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 n.1 (9th Cir. 2014) (en banc).

plaintiffs have raised a triable issue of fact on their Fourth Amendment claim.

## 2.  It was clearly established that continuing to shoot a suspect who appears incapacitated violates the Fourth Amendment

Even when an officer violates a suspect's Fourth Amendment rights, she is not necessarily liable for money damages under 42 U.S.C. § 1983.  Unless the officer "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known," she is entitled to qualified immunity.  *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam) (quoting *Kisela*, 584 U.S. at 104).  Qualified immunity ensures that "the officer had fair notice that her conduct was unlawful" when "judged against the backdrop of the law at the time of the conduct," *Kisela*, 584 U.S. at 104 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)), thus protecting "all but the plainly incompetent or those who knowingly violate the law," *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

In determining whether a right is clearly established, we consider "[our] own and other relevant precedents."  *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (cleaned up) (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n.9 (1984)); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding that the defendants' conduct violated clearly established law "in light of binding Eleventh Circuit precedent" without deciding whether Supreme Court precedent also clearly established the principle).  "We do not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), or one "involving 'fundamentally similar' facts," *Hope*,

536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 263 (1997)), but "existing precedent must have placed the statutory or constitutional question beyond debate," *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *White*, 580 U.S. at 79).

In addition, "the clearly established right must be defined with specificity." *Emmons*, 586 U.S. at 42. The right's contours must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 584 U.S. at 105 (quoting *Plumhoff*, 572 U.S. at 779). Although "general statements of the law are not inherently incapable of giving fair and clear warning," *Hope*, 536 U.S. at 741 (quoting *Lanier*, 520 U.S. at 271), "specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that 'it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts,'" *Mullenix*, 577 U.S. at 12 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). The "general rules" from *Garner* and *Graham* "do not by themselves create clearly established law outside an 'obvious case.'" *Kisela*, 584 U.S. at 105 (quoting *White*, 580 U.S. at 80).

In 2020, it had been clearly established for several years that an officer cannot reasonably "continue shooting" a criminal suspect who "is on the ground," "appears wounded," and "shows no signs of getting up" unless the officer first "reassess[es] the situation"—"particularly . . . when the suspect wields a knife rather than a firearm"— because the suspect "may no longer pose a threat." *Zion*, 874 F.3d at 1076. Defendants do not contest this. Rather, they dispute the factual premise, arguing that Hernandez was "clearly a serious threat" for the duration of the shooting.

But as we have explained, the immediacy of the threat abated by the end of the second volley, when Hernandez was curled up on the ground and rolling away from McBride. *Zion* squarely controls this case.

In *Zion*, two officers confronted a suspect who had "bit his mother and cut her and his roommate with a kitchen knife." *Id.* at 1075. When the first officer arrived at the scene, "Zion ran at him and stabbed him in the arms." *Id.* As Zion ran away toward his apartment complex, the second officer shot him nine times, causing him to fall to the ground, *id.*, at which time Zion "appear[ed] to have been wounded and [was] making no threatening gestures," *id.* at 1076, although he was "still moving," *id.* at 1075.

There was no dispute that the first nine shots were reasonable. *See id.* The excessive force claim arose from the second officer's next two actions. First, he ran up to Zion and fired another volley of nine rounds at Zion's body. *Id.* Then, while Zion was curled up on his side in a fetal position, the officer took a running start and stomped on Zion's head three times. *Id.* We held that either of these actions could constitute excessive force. *See id.* at 1076.

With respect to the second volley of shots, we explained that "[a] reasonable jury could find that Zion was no longer an immediate threat" because he "was lying on the ground and so was not in a position where he could easily harm anyone or flee." *Id.* (emphasis omitted). While acknowledging that the officer "couldn't be sure that Zion wasn't bluffing or only temporarily subdued," we held that such uncertainty did not preclude a finding that the officer "should have held his fire unless and until Zion showed signs of danger or flight." *Id.* Of particular relevance here, we distinguished Zion's continued, nonthreatening movements

from an attempt to get up.  *See id.* (rejecting argument that the officer's "continued use of deadly force was reasonable because Zion was still moving" given that "Zion show[ed] no signs of getting up").

Here, Hernandez was apparently trying to get up after the first volley of shots, but the video footage supports a different conclusion after the second volley.  A jury could conclude that his continued movements on the ground were due to pain from four gunshot wounds and that his movements, like Zion's, were nonthreatening.  And, as in *Zion*, a jury could reasonably conclude that McBride "could have sufficiently protected [her]self and others" after Hernandez fell by pointing her gun at him "and pulling the trigger only if [he] attempted to flee or attack."  *Id.*

Judge Collins's partial dissent would distinguish *Zion* based on a red herring.[6]  In a footnote to *Zion*, we speculated—based on counsel's unsupported assertions at argument—that "[i]t may be that, once on the ground, Zion had dropped the knife."[7]  *Id.* at 1076 n.2.  But our decision

---

[6] Like Judge Nelson, Judge Collins relies on the improper factual inference that Hernandez "managed" to roll back toward McBride and "get" his knee and arm on the ground.  Collins Op. at 56 n.5; *accord* R. Nelson Op. at 31 (asserting that Hernandez "reorient[ed] himself toward the officers" and "began pushing himself up with one arm").  The video evidence does not conclusively show that Hernandez's final movements were intentional rather than convulsive.  Thus, we cannot infer that Hernandez was "trying to get up" after the second volley, Collins Op. at 67, which improperly views the evidence in the light least favorable to the party resisting summary judgment.  *See Scott*, 550 U.S. at 380.

[7] In briefing, the *Zion* plaintiff conceded that the only evidence in the record—officer video of the incident—did not show Zion dropping the knife.  *See* Appellant's Opening Br. at 12 n.4, *Zion*, 874 F.3d 1072 (No.

did not turn on whether Zion continued to grip the knife—there was no evidence he had dropped it, the parties had never litigated the issue, and we assumed for discussion purposes that "the suspect *wields* a knife" and might still "attempt[] to . . . attack" the officer.**[8]** *Id.* at 1076 (emphasis added). To the extent Zion's continued possession of the knife was relevant at all in that case, it was only because the officer was standing a mere four feet away—within striking distance. *See id.* at 1075. Here, in contrast, McBride was standing approximately 36 feet from where Hernandez had fallen, a distance at which Hernandez's possession of the knife did not present an immediate threat if he was not trying to get up.

---

15-56705). At argument, counsel for the *Zion* plaintiff asserted that Zion *had* dropped the knife, claiming that police photographs showed the knife "a few feet away from the body." Oral Argument at 6:30–7:35, *Zion*, 874 F.3d 1072 (No. 15-56705), https://youtu.be/7-IpfHFAEIU?t=390. In response, the judge who authored the opinion described the photographic evidence as "perspectives that the officer doesn't have." *Id.*

[8] Judge Collins finds our discussion of the *Zion* oral argument and briefing "troubling" because "reasonable officers . . . no longer can rely on what our opinions actually say." Collins Op. at 72. We agree that our case law must provide fair notice, and of course officers are not expected to "delve into the court records." *Id.* at 73. But anyone who parses the footnotes of our opinions for hidden holdings—as does Judge Collins—would have no difficulty accessing these publicly available materials. We cite them not because they affect our analysis but to contextualize why Judge Collins's reliance on this footnote is misplaced. That is clear enough from the footnote itself, which begins: "It may be that"—indicating that the speculation that follows is counterfactual to the analysis in the main text. As for Judge Collins's charge that we are "improperly alter[ing]" *Zion* by "editing out [a] phrase," *id.* at 72, he overlooks that we already set out the missing phrase in full. *See* Maj. Op. at 23.

Because it was clearly established that McBride acted unreasonably if she shot Hernandez after he was on the ground and no longer posed an immediate threat, she is not entitled to qualified immunity. Therefore, we reverse the district court's grant of summary judgment on plaintiffs' Fourth Amendment claim for excessive force and remand for further proceedings.

## B. Remaining Claims

Because the district court granted summary judgment on plaintiffs' state law claims solely for lack of a Fourth Amendment violation, we reverse that ruling as well. Plaintiffs also challenge the district court's grant of summary judgment on their Fourth Amendment claim for municipal liability and Fourteenth Amendment claim for violating their right to family integrity. We agree with and adopt the three-judge panel's discussion of those issues, including M.L.H.'s challenge to the district court's discovery rulings, *see United States v. Depue*, 912 F.3d 1227, 1229 (9th Cir. 2019) (en banc), and therefore affirm the district court's rulings. *See Est. of Hernandez*, 96 F.4th at 1221–23.

**AFFIRMED in part; REVERSED in part; and REMANDED.** Each party shall bear its own costs.

R. NELSON, Circuit Judge, with whom BRESS and BUMATAY, Circuit Judges, join, and with whom BADE, Circuit Judge, joins as to Parts I–III, IV.A, and V, concurring in part and dissenting in part:

I agree with Judge Collins that Officer Toni McBride was entitled to qualified immunity. Collins Diss. § II.B. But Officer McBride never violated the Fourth Amendment in the first place. As the panel unanimously concludes, Officer McBride was justified in shooting Daniel Hernandez to alleviate the risk that he posed when he advanced toward her while armed and ignoring commands to stop. Contrary to the majority's conclusion, however, Officer McBride's six shots over six seconds did not trigger a duty to reassess the risk Hernandez posed, particularly where he remained armed and in motion during that entire time. For similar reasons, I would affirm the district court's dismissal of the state-law claims. And I agree to affirm the district court's dismissal of Plaintiffs' substantive due process right claims. Maj. Op. at 27; Collins Diss. at 75.

The majority correctly concludes that Officer McBride was justified in shooting Hernandez because he was armed, had ignored warnings, and posed a risk. Officer McBride shot six times over six seconds to neutralize that risk. Her actions fell well within the range of conduct sanctioned by the Supreme Court in *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014), which holds that an officer may continue shooting until the risk is alleviated. No reasonable jury could conclude that during those six seconds, Officer McBride had a duty to reassess the risk posed by Hernandez.

The majority errs in holding otherwise. It ignores that officers are forced and allowed "to make split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). And it judges Officer McBride's actions not "from the perspective of a reasonable officer on the scene," but "with the 20/20 vision of hindsight." *Id.* at 396.

The majority demands that we go an order of magnitude beyond impermissibly judging from hindsight. Going forward, if there is body-camera footage, we must press our noses against our computer screens, slow down the playback speed, pull out a stopwatch, and analyze a fraction of a second on loop to determine whether the (often infinitesimal) pauses between bursts of initially defensive lethal force make reasonable force unreasonable. And in construing the totality of the circumstances, the majority ignores all circumstances favorable to the officer and inserts its judgment rather than looking to how an objectively reasonable officer experiencing the events in real time would perceive the immediacy of the threat. This flouts precedent from the Supreme Court and this circuit. For that reason, I dissent.

## I

First, the facts from Officer McBride's perspective, taking all reasonable inferences for the plaintiff.[1] *See S.B. v. City of San Diego*, 864 F.3d 1010, 104 (9th Cir. 2017). Officers McBride and Shuhei Fuchigami stopped to assist a multi-vehicle car crash while on patrol. They exited their vehicle to a chaotic scene; a totaled pick-up truck to their right, a totaled sedan to their left, two other vehicles

---

[1] Officer McBride's body camera footage of the incident is available to watch here: https://www.youtube.com/watch?v=PtSSNn_0GCU&rco=1. We adopt "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

damaged nearby, and four lanes of the street strewn with bits of destroyed automobiles. They were surrounded by at least 25 people, some screaming and yelling. They were warned over the radio that a male suspect was armed with a knife. One of the bystanders also warned them of a "crazy guy with a knife" in the black truck who "was threatening to hurt both himself and others."

Enter a shirtless Daniel Hernandez, who the officers just saw grabbing something from the center console of his destroyed truck. Hernandez aggressively approached the officers with his arms outstretched at a 45-degree angle. Officer McBride correctly assessed that he was under the influence of methamphetamine "based upon her observations of Hernandez being shirtless, sweating profusely, acting jittery and agitated, [and] refusing to comply with directives" all "while also displaying an overly aggressive behavior." Officer McBride quickly determined that Hernandez was armed with a blade. With her duty weapon raised, she repeatedly warned him to stop and drop the weapon. Undeterred, Hernandez advanced upon the officers. After her repeated commands and warnings failed, Officer McBride fired her service firearm to stop Hernandez.

Officer McBride's use of lethal force lasted 6.18 seconds. Only after her repeated warnings did she use lethal force—two shots, 0.73 seconds apart. These shots—shots one and two—forced Hernandez to the ground. Officer McBride again warned Henandez to drop the knife, a directive he ignored. Then, 2.53 seconds after the second shot, Officer McBride fired two more shots—0.73 seconds apart—after Hernandez oriented his body toward them and rose halfway to a standing position while yelling. After these shots—shots three and four—Hernandez rolled backwards.

Hernandez, on his back, then pushed his legs upwards as if to gain momentum, brought his knees to his torso, rolled onto his side, repositioned himself onto his forearm and elbow, and again began to push himself up while facing away from Officer McBride. He was not, as the majority posits, "balled up in a fetal position." Maj. Op. at 20; *see also* Collins Diss. at 55 n.4. So, 1.36 seconds after her fourth shot, Officer McBride fired her fifth shot—which the majority contends was the start of a third volley. Maj. Op. at 8. Hernandez continued rolling and, after reorienting himself toward the officers, again began pushing himself up with one arm. Only after this, and 0.83 seconds after her fifth shot, does Officer McBride fire upon Hernandez for a sixth and final time. The majority concedes that the 0.73-second pauses after shots one and three did not create new volleys. Maj. Op. at 8 (Officer McBride fired "three distinct volleys of two shots.").

## II

That leads us to today's perplexing result. The majority concludes that firing six shots in around six seconds at an armed and moving threat leads to not one, but two duties to reassess. Maj. Op. at 19 (analyzing duty to reassess after "the first volley"); Maj. Op. at 21 (same for "after the second volley"). But under these circumstances, there was never a duty to reassess. Once it is agreed that Officer McBride was justified in shooting to kill, she cannot be reasonably expected or required to reassess her shooting in a tight six-second period during an intense and dangerous situation throughout which Hernandez was rising and never stopped moving.

Judge Collins is correct that Officer McBride is entitled to qualified immunity because her conduct was not clearly

unlawful at the time.  *See* Collins Diss. § II.B.  But she is entitled to qualified immunity for another reason:  she never "violated a federal statutory or constitutional right." *Waid v. County of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quotation omitted).  Officer McBride's seizure of Hernandez was objectively reasonable, and she therefore did not violate the Fourth Amendment.

A

In *Graham*, the Supreme Court held that excessive force claims are properly analyzed under the Fourth Amendment's "objective reasonableness standard."   490 U.S. at 388. Assessing whether an officer's seizure is objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.

In this analysis, the most important question is "whether the suspect posed an immediate threat." *Zion v. County of Orange*, 874 F.3d 1072, 1075 (9th Cir. 2017) (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)). And the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

To that end, "police officers are justified in firing at a suspect in order to end a severe threat to public safety" and "need not stop shooting until the threat has ended." *Plumhoff*, 572 U.S. at 777.  But that justification has limits. As we noted in *Zion*, "[i]f the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting."   874 F.3d at 1076.   The majority, however, extends *Zion*'s stop-and-reassess requirement to an absurd and dangerous extreme that runs headlong into *Plumhoff*, which controls the outcome of this case.

In *Plumhoff*, Rickard engaged officers in a car chase. 572 U.S. at 768–69.  During the chase, Rickard crashed into an officer's vehicle, spinning into a parking lot and colliding with another officer's vehicle.  *Id.* at 769.  Rickard, "in an attempt to escape," reversed his vehicle as two officers approached him on foot.  *Id.* at 769–770.  Rickard then crashed into another officer's vehicle while reversing and did not take his foot off the gas (he could not move, however, as the third officer's vehicle he collided with blocked his way).  *Id*. at 770.  In response, an officer fired three shots at Rickard.  *Id.*  Then, Rickard managed to break his car free of the vehicle behind him, "reversed in a 180 degree arc," and "'maneuver[ed] onto' another street."   *Id.* (quotation omitted).   So two other officers "fired 12 shots toward Rickard's car, bringing the total number of shots fired during this incident to 15."  *Id.*  Rickard lost control of the vehicle, crashed, and "died from some combination of gunshot wounds" and car-crash injuries.  *Id.*

The Supreme Court's analysis of Rickard's daughter's claims is instructive, and its logic is binding.  Rickard's daughter claimed that the first three shots were unjustified because the chase had ended when Rickard's car was stuck

after reversing.  *Id.* at 775.  She also claimed that the officers used excessive force by firing fifteen shots.  *Id*.  The Supreme Court, rebutting the first argument, found that the chase was not over because "[l]ess than three seconds" after temporarily being brought to a standstill, "Rickard resumed maneuvering his car," *i.e.*, accelerating in reverse.  *Id*. at 776.  "Under the circumstances at the moment when the shots were fired, all that a reasonable officer could have concluded was that Rickard was intent on resuming his flight."  *Id.* at 777.

The Court was also unmoved by Rickard's daughter's second argument.  The Court found that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."  *Id.*  And "if lethal force is justified, officers are taught to keep shooting until the threat is over."  *Id.*  Critically, "during the 10-second span when all the shots were fired, Rickard never abandoned his attempt to flee."  *Id.*

The same is true here.  The video shows an armed Hernandez advancing upon Officer McBride, and never "abandon[ing] his attempt" to threaten her.  *Id.*  And, unlike in *Plumhoff*, Officer McBride did not pause for three seconds to determine whether the threat was controlled, nor should she have been expected to do so.  The majority does not distinguish *Plumhoff*.  And under *Plumhoff*, Officer McBride's six shots over six seconds cannot be parsed out.  The shooting was justified from the start.  And nothing required Officer McBride to cease her efforts to ensure an armed and threatening man rising or moving throughout a short six-second timeframe was fully subdued.

*Zion* provides no haven for the majority. Zion—the suspect—was "on the ground and appear[ed] wounded" after the officer "shot at [him] nine times at relatively close range." 874 F.3d at 1075. The officer then ran up to Zion, who was "making no threatening gestures" and was "lying on the ground . . . not in a position where he could easily harm anyone or flee." *Id.* at 1075–76. There was also a factual dispute about whether the suspect remained armed. *See id.* at 1076 & n.2. Still, the officer fired nine more rounds while standing at even closer range. *Id.* at 1075. If that were not enough, after he fired shots nine through eighteen, the officer took a running start and stomped on the suspect's head three times. *Id.* In those circumstances, "a reasonable officer would reassess the situation rather than continue shooting[,]" *id.* at 1076, or proceed to stomping.

Thus, *Zion*'s utility in determining whether Officer McBride's use of force was reasonable is limited. And *Zion* does not hold that an exception to *Plumhoff* applies based on a new volley of shots.[2] Nor could it: our precedent cannot displace the logic and reasoning of *Plumhoff*.

Instead, *Zion* is best understood as an elaboration upon the Supreme Court's explanation that *Plumhoff* "would be a different case if petitioners had initiated a second round of shots after an initial round had *clearly incapacitated* [the suspect] and had *ended any threat of continued flight*." 572 U.S. at 777 (emphases added). *Zion* turns upon an

---

[2] *Zion* has little to say about volleys of shots and does not dwell on timing at all. 874 F.3d at 1075–76. Instead, it discusses at length that the suspect was not threatening the officer and could not harm anyone. *Id.* Accordingly, even if we adopted *Zion*'s reasoning (we which need not sitting en banc), *Zion* does not control whether a new volley mandates reassessment.

objectively reasonable officer's knowledge that the suspect was clearly incapacitated and therefore not an immediate threat. 874 F.3d at 1076 ("Zion *was* lying on the ground and so was not in a position where he could easily harm anyone or flee. . . [Z]ion was no longer an immediate threat.").

*Zion* may provide some guideposts for finding that an officer should have known a suspect was "clearly incapacitated," *see Plumhoff*, 572 U.S. at 777, thus triggering a duty to reassess. But those guideposts do not suggest that Officer McBride was required to stop firing within six seconds.

To avoid these logical flaws, the majority misreads *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010). It claims that in *Wilkinson*, we "recognized that officers may need 'to reevaluate whether a deadly threat has been eliminated after each shot' if circumstances permit." Maj. Op. at 20 (quoting *Wilkinson*, 610 F.3d at 552). We held just the opposite. *Wilkinson* actually said, "[t]o the extent that [our case law] requires an officer to reevaluate whether a deadly threat has been eliminated after each shot, we disagree that it should be applied in the circumstances of this case." 610 F.3d at 552. *Wilkinson* disclaimed the majority's holding, because "[s]uch a requirement places additional risk on the officer not required by the Constitution." *Id.* And, just like in *Wilkinson*, Officer McBride "did not shoot mindlessly, but responded to the situation by ceasing fire [after her sixth shot] after [s]he perceived that . . . the threat had been eliminated." *Id.*

Put simply, there is no duty to reassess after each shot over a six-second period in a high-intensity situation like the one here. Imposing that duty flouts *Plumhoff*. Rather, a duty to stop firing arises only if an objectively reasonable officer

would view the suspect as clearly incapacitated. And it beggars belief that an objectively reasonable officer would think Hernandez was incapacitated in just 1.36 seconds when he had just attempted to rise and was still in motion.

B

Even taking the majority's artificial construct on its own terms, its analysis does not satisfy our totality-of-the-circumstances test. The majority posits that the Fourth Amendment's reasonableness analysis rises and falls on just 1.36 seconds between shots four and five. All while acknowledging that a 0.73-second delay between shots one and three did not constitute a separate volley or create a new duty to reassess risk. Thus, under the majority's deviation from *Plumhoff*, this case turns on a mere 0.63 seconds (the difference between the 1.36-second window requiring reassessment and the 0.73 seconds which did not) to find a constitutional violation. Further, during that split second, Hernandez remained armed and was in constant motion. No case has ever made such a holding.

It is also impossible to square this holding with blackletter law. First, the majority's analysis elides that our reasonableness analysis looks to the totality of the circumstances. *See Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 392 U.S. 1, 8–9 (1985)). Our reasonableness analysis "requires careful attention to facts and circumstances of each particular case." *Id*. Thus, the question is "whether the totality of the circumstance justified a particular sort of seizure." *Id.* (cleaned up). We look to a host of factors when assessing the totality of the circumstances, but those relevant here are (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and

(3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

The majority glosses over this test, mentioning the "totality of the circumstances" only twice. Maj. Op. at 12, 15. And the majority's analysis rises and falls on a split second—0.63 seconds to be exact. As the majority tells it, this fraction of a second was enough to impose a duty to reassess since "Hernandez no longer posed an immediate threat." *Id.* at 21. He was apparently no longer a threat because he was armed with a blade and out of striking distance, and it was not apparent he could get up. *See id.*

But what had changed? Not the totality of the circumstances. *See Graham*, 490 U.S. at 396. The severity of the crime at issue never changed in the 0.63 seconds which the panel claims forced Officer McBride to reassess. From Officer McBride's perspective, Hernandez still caused a multi-vehicle crash while under the influence of methamphetamine and was threatening others with a blade. He was also "actively resisting arrest" before any shots were fired, was approaching Officer McBride armed, and was not complying with her repeated warnings. *Id.*; *see also Hart v. City of Redwood City*, 99 F.4th 543, 552 (9th Cir. 2024) (suspect was resisting arrest under *Graham* when he refused "commands to 'drop the knife' . . . while exhibiting a deadly weapon," a "crime[] in California.") (quotation omitted).

The panel, then, relies solely on the immediacy of the threat. Maj. Op. at 20–22. But, again, a fraction of a second before, the majority admits there would be no need to reassess. No reasonable officer could determine that Hernandez no longer "pose[d] an immediate threat to the safety of the officers or others" in just 1.36 seconds (a mere 0.63 seconds longer than the breaks after the first and third

shots where the majority agrees no constitutional duty to reassess arose). *Graham*, 490 U.S. at 396. And the majority does not explain what makes this 0.63-second difference material. A split second cannot change the reasonableness of Officer McBride's use of force. *See id*. at 397; *Wilkinson*, 610 F.3d at 553 (no duty to reassess where "no evidence that" officer "had immediately perceived" change in threat).

The majority's characterization of Officer McBride's shots also warps our understanding of how an objectively reasonable officer perceives time. Officer McBride fired six times in about 6.18 seconds. More than two-and-a-half of those seconds were the pause between what the majority describes as the first and second volleys. And the pause between the second and third shots is almost double the 1.36 seconds that the majority concludes creates a duty to reassess after the fourth shot. The majority wrongly places legal significance on the delay between the fourth and fifth shots. But because the majority concedes that the third and fourth shots were justified, Officer McBride was not required to "stop shooting until the threat ha[d] ended." *Plumhoff*, 572 U.S. at 777.[3]

The majority's flawed reasoning also creates perverse incentives. *Zion* stands for the rational requirement that if an officer knows that a threatening suspect is incapacitated, the officer ought to pause and reassess. That is exactly what

---

[3] The majority also relies on the Board of Police Commissioners' conclusion that the third volley violated department policy. Maj. Op. at 20. But we have never delegated the interpretation of the Constitution to a police department. "[W]e may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable" but those guidelines "are not dispositive." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003).

Officer McBride did here.  Instead, from the comfort of our chambers, we will now second-guess every millisecond's pause after the use of initially reasonable force.  Our unfortunate message is that any millisecond an officer tarries in protecting herself and others is a millisecond closer to liability.  That rule discourages any reassessment.  When in doubt, officers should now continue shooting or risk liability.  Not a great message.

The majority fails to grapple with these concerns. Instead, the majority erects a straw man.  I do not suggest that "6.2 seconds is insufficient as a matter of law" to mandate reassessment.  Maj. Op. at 21 n.5.  If an officer clearly incapacitates a suspect in the first second of a six-second timeframe, the reasonableness of firing another five shots could create a jury question.  That question, however, hinges on the totality of the circumstances, not one single isolated factor.  Considering the totality of the circumstances, the 0.63 seconds under which the majority hinges its analysis cannot be enough time to reassess the threat posed by Hernandez—particularly where he remained moving and armed.

To excuse this elision, the majority retreats to precedent finding constitutional violations in time-sensitive circumstances where the officer "unnecessarily create[s] their own sense of urgency."  *Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019) (cleaned up); *see* Maj. Op. at 21 n.5 (citing *Wilkinson*, 610 F.3d at 552; *Nehad*, 929 F.3d at 1134–35).  "When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation."  *Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008).  So we account for how an officer contributed to escalating the situation when

weighing the totality of the circumstances.  *See Nehad*, 929 F.3d at 1135–36.

That precedent has no application here.  An officer's reaction to an emergency she created relates to the initiation of force.  *E.g.*, *id.* at 1135 (officer did not identify himself as law enforcement and did not warn suspect before firing); *Torres v. City of Madera*, 648 F.3d 1119, 1126 (9th Cir. 2011) (officer did not follow firearm/taser separation policy and did not draw weapon before confronting suspect).  The majority found the first four shots constitutional.  So this is not a case where Officer McBride's "own poor judgment and lack of preparedness caused her to act with undue haste." *Torres*, 648 F.3d at 1126; *accord Nehad*, 929 F.3d at 1135. By finding as much in a split-second window, the majority crafts a loophole that negates *Plumhoff*—continuing to fire with *Plumhoff*'s blessing is now verboten under an unrelated strain of cases.

### III

Appellants also claim that Officer McBride and the City of Los Angeles are liable for negligent wrongful death, assault, and battery, and violating California's Bane Civil Rights Act, Cal. Civ. Code § 52.1.4.  Wrongful death, assault, and battery all have unique elements under California law.  But in our posture, they all share one:  the officer must have "unreasonably used deadly force." *Koussaya v. City of Stockton*, 54 Cal. App. 5th 909, 932 (2020).  The district court found that "Officer McBride's use of force was reasonable," and therefore concluded that "Defendants are also entitled to summary judgment on Plaintiffs' remaining state-law claims."  *Est. of Hernandez v. City of Los Angeles*, No. 2:20-cv-04477, 2021 WL 4139157, at *10 (C.D. Cal. Aug. 10, 2021).

Generally, "[t]he U.S. Constitution and California common law are . . . two distinct legal frameworks." *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1122 (9th Cir. 2021). Accordingly, state-law claims should be analyzed individually, and analogizing to federal constitutional standards should be done only when state courts adopt them into their corpus of law. *See id.* at 1122. And district courts should be particularly cautious where there is reason to believe that at least California's negligence analysis is not coextensive with the Fourth Amendment's. *E.g.*, *Hayes v. County of San Diego*, 305 P.3d 252, 263 (Cal. 2013) (negligence law in California "is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used."); *see also Tabares*, 988 F.3d at 1128.

Here, though, no party has argued how California's negligence or assault and battery reasonableness standards diverge from the Fourth Amendment in a dispositive way. And the Bane Act claim as alleged by Appellants relies on a Fourth Amendment violation. So that claim is coextensive with the federal constitutional analysis, and it fails because Officer McBride's use of force was reasonable. *See Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015) (the Bane Act requires a violation of a right rooted in state or federal law). Thus, I would affirm the district court's grant of summary judgment on the state-law claims.

## IV

Finally, Appellants raise substantive due process claims under the Fourteenth Amendment. Hernandez's parents allege that the defendants violated their substantive due process right to companionship of their adult child. Likewise, Hernandez's minor daughter asserts a substantive

due process right to companionship of her father.  I agree that we should affirm the district court's dismissal of these claims.

A

The district court granted summary judgment for Defendants on Hernandez's parents' and child's "Interference with Familial Integrity Substantive Due Process Violation" claims.  The three-judge-panel affirmed the district court.  And the en banc majority adopts the three-judge panel's discussion of this issue.  Maj. Op. at 27.  Because directing lethal force toward an armed and persistent threat does not "shock the conscience," *Wilkinson*, 610 F.3d at 554, I agree with the majority that the record does not support these substantive due process claims under our precedent, Maj. Op. at 27.

B

But Plaintiffs' substantive due process claims fail for a more fundamental reason.  We seem to have stumbled our way into recognizing the substantive due process rights of parents to the companionship of their adult-children and of children to the companionship of their parents.  After *Washington v. Glucksberg*, 521 U.S. 702 (1997), our unreasoned decisions assuming such rights require reexamination.

In *Glucksberg*, the Supreme Court required us to conduct an exacting two-step inquiry before recognizing new substantive due process rights.  First, we must carefully describe "the asserted fundamental liberty interest."  *Id.* at 720–21.  And then we must determine whether that liberty interest is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty,

such that neither liberty nor justice would exist if they were sacrificed." *Id.* (cleaned up). We have never conducted a *Glucksberg* analysis to recognize whether a parent has substantive rights over their adult children or whether a child has a right to companionship with a parent. And we are unique in recognizing a parental interest in this regard.

The majority does not perform the *Glucksberg* analysis, either. And we did not ask for briefing on whether these purported substantive companionship rights are objectively deeply rooted in our nation's history and tradition or implicit in the concept of ordered liberty. Instead, the majority summarily adopts the three-judge panel's analysis which presupposed that these rights exist. For this reason, the majority's opinion cannot be read as our court, sitting en banc, conducting the requisite *Glucksberg* analysis needed to recognize these rights in the first place. Our precedents have never been justified under the proper *Glucksberg* framework.

1

Start with a parent's right to his or her adult child's companionship. The Supreme Court recognizes some parental interest in their minor children. But those interests are typically confined to parental custody or decision-making regarding a minor child's upbringing. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 396–99 (1923) (identifying the right to "establish a home and bring up children"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

The Supreme Court has also recognized that states may not unjustifiably interfere with the "formation and preservation of certain kinds of highly personal relationships." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). These include those that "attend the creation and sustenance of a family," including the rearing of children. *Id.* at 619; *accord Meyer*, 262 U.S. at 399; *May v. Anderson*, 345 U.S. 528, 533 (1953). That interest extends to a parent's autonomy to decide questions related to the "custody, care and nurture of the child." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Prince*, 321 U.S. at 166); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (same).

We followed those principles, and in *Morrison v. Jones*, 607 F.2d 1269, 1275 (9th Cir. 1979) (per curiam), we held that a parent's relationship with her minor child is constitutionally protected. There, we found that the plaintiff, whose minor child was deported because she could not adequately care for him, had a constitutional interest in "preserv[ing] her access to [her] child." *Id.* at 1271–72, 1275. *Morrison* was rooted in the basic principle that a parent has a protected custodial interest in her minor child. *Id.* at 1275 (citing *Stanley*, 405 U.S. at 651).

We have since gone further, and with little to no explanation. In *Strandberg v. City of Helena*, 791 F.2d 744, 746 (9th Cir. 1986), parents of a 22-year-old decedent asserted constitutional claims against state officials after their son hung himself in prison. The district court dismissed most of the claims, including the Fourteenth Amendment claim asserting the "right to parent." *Id.* We recognized that the parents-plaintiffs "had not been deprived of any constitutional right to parent" because the decedent reached adulthood. *Id*. at 748. But we still found that the "district

court did not . . . dismiss the" parent-plaintiffs' "fourteenth amendment right to companionship and society of the decedent." *Id.* at 748 n.1. Accordingly, we found that this claim could proceed under the Fourteenth Amendment. *Id.* That short sentence in a footnote constitutes our entire analysis.

Our lack of explanation seems to underlie our jurisprudence in this area. In *Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998), we assumed, again without explanation, that a parent could proceed with a Fourteenth Amendment claim to vindicate the loss of companionship of an adult child—although we ultimately held that the parents' claim failed. This lack of explanation in recognizing a new substantive due process right remains a disturbing feature of our jurisprudence. *See, e.g.*, *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008); *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998). In none of these cases did we discuss whether special circumstances, such as the adult child's age or living arrangements, may allow his parents to assert a constitutional right to a familial relationship. Nor did we ground such a conclusion in the Constitution's text or our Nation's history and tradition.

This puts us at odds with nearly every circuit to address the question. Like us, other circuits have recognized a substantive due process right to the companionship of a minor child. But none has extended that right to an adult child. And most have rejected such an extension. *See Valdivieso-Ortiz v. Burgos*, 807 F.2d 6, 8–9 (1st Cir. 1986); *McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003); *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005); *Robertson v. Hecksel*, 420 F.3d 1254, 1259–60 (11th Cir. 2005); *Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001). Only the Tenth Circuit recognizes such a broad right, and it

roots the right in the First, not Fourteenth, Amendment.  *See Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1188–89 (10th Cir. 1985).

We are thus an outlier in entertaining a parent's substantive due process right to the companionship of adult children.  Worse, we have never followed the careful process required by *Glucksberg*.  Had we done so, we likely would conclude as the Third Circuit reasoned, that it would be a "serious mistake . . . to extend the liberty interests of parents into the amorphous and open-ended area of a child's adulthood."  *McCurdy*, 352 F.3d at 829.

2

Next, a child's right to his or her parent's companionship.  Here too, we appear to have stumbled into recognizing this right.  Not long after we first assumed parents' liberty interest in their adult child in *Strandberg*, we recognized that the right was reciprocal in *Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999).  There, we held "that a child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest" because the "distinction between the parent-child and the child-parent relationships does not . . . justify constitutional protection for one but not the other."  *Id.* at 1419.  We cited the unreasoned footnote in *Strandberg*—which assumed a parent's right to the companionship of adult children—for support.  *Id.* (citing *Strandberg*, 791 F.2d at 748 n.1).  After years of stacking unreasoned precedent upon unreasoned precedent, it is now blackletter law in this circuit that a child has a constitutionally recognized interest in the companionship of her parents.  *See, e.g.*, *Ochoa v. City of*

*Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).[4]

There is reason to doubt that such a right exists under *Glucksberg*.    When recognizing a right to familial companionship, we have relied on Supreme Court case law about parental rights to raise their children. *See, e.g.*, *Meyer*, 262 U.S. at 399, 403; *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535–36 (1925). That right is founded on the historical tradition that parents have authority in the custody and care of their children. *See* Mary Ann Mason, *From Father's Property to Children's Rights: The History of Child Custody in the United States* 7 (1994); *see also* § 1:5.    Presumption for father, Child Custody Prac. & Proc. & n.9 (2024 Update) (citing *Baird v. Baird*, 21 N.J. Eq. 384, 388, 1869 WL 3749 (Ct. Err. & App. 1869); *Carr v. Carr*, 63 Va. 168, 22 Gratt. 168, 1872 WL 5192 (1872)).    It makes little sense to transform those cases into cases about children's rights. *See, e.g.*, *Parham v. J.R.*,

---

[4]Many of our sister circuits appear to recognize this right. *See, e.g.*, *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977); *Wooley v. City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000); *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir. 2000); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir. 1997).    Others are undecided. *See, e.g.*, *White v. City of Vineland*, No. 116CV08308JDWAMD, 2022 WL 16637823, at *1 (D.N.J. Nov. 2, 2022) (discussing the Third Circuit's silence on this issue); *Stratton v. Mecklenburg Cnty. Dep't of Soc. Servs.*, 521 F. App'x 278, 295 (4th Cir. 2013) (unpublished) (Gregory, J., concurring) (whether this right exists is an "open question in this Circuit."). At least one circuit has questioned the right. *See Chambers v. Sanders*, 63 F.4th 1092, 1097–99 (6th Cir. 2023) (assuming that such a liberty interest exists but stating that "the Ninth Circuit's view" that children have a right to paternal companionship based on state actions incidentally impacting their familial relations "is based primarily on a broad reading of the substantive due process right to family association").

442 U.S. 584, 601, 603–04 (1979) (allowing parents to override children's wishes and commit them to mental hospitals—while never suggesting that children have a right to the companionship of their parents). At the very least, that shift requires *some* explanation—which, again, we have never provided.

As noted above, any parental right stems from the authority that parents had to oversee the upbringing of their children. As it turns out, the historical record suggests that this authority is premised less on parental "rights," and more on parental "duties." The law imposes a *duty* on parents to teach and care for their children. That duty carries with it a corresponding interest in raising children, which is what the case law calls a parental "right." But even phrased as a right, any parental interest "is derived from" the duty to rear them properly. W. Blackstone, 1 *Commentaries on the Laws of England* \*438–\*441; 2 James Kent, *Commentaries on American Law* 162–63 (1827). If parents breach that duty, they lose the corresponding "rights." *E.g.*, 2 Kent, *supra*, at 182.

In light of this historical understanding, does it make sense to transform a parental duty into a child's right to companionship? If children do not have a duty to care for their parents, why would they have the corresponding "right" to enjoy their parents' companionship?

Look at the issue from another angle. Our legal tradition has long presumed that children are too young to assert their own interests. *Parham*, 442 U.S. at 602–03. So the law trusts parents to assert those interests on their children's behalf. *See id.*; *see also Brach v. Newsom*, 38 F.4th 6, 21–22 (9th Cir. 2022) (en banc) (Paez, J., dissenting) ("[T]he *Meyer-Pierce* right is a right asserted *by parents*." (emphasis

in original)).  Given that practice, it is hard to conclude that parental companionship rights are reciprocal for the child.  If parents hold and exercise their children's rights, how could children have a substantive due process right in the companionship of their parents independent of the parents' interests?

Of course, this historical analysis is preliminary.  Our circuit has never done the requisite substantive due process analysis required under *Glucksberg* to determine whether a child possesses a constitutionally protected parental companionship interest.  This issue was never briefed, partly because Plaintiffs have shown no claim under our case law.  The Supreme Court has also "never had occasion to decide whether a child has a liberty interest, symmetrical with that of her parent, in maintaining her filial relationship." *Michael H. v. Gerald D.*, 491 U.S. 110, 130 (1989); *Troxel v. Granville*, 530 U.S. 57, 88 (2000) (Stevens, J., dissenting) ("[T]his Court has not yet had occasion to elucidate the nature of a child's liberty interests in preserving established familial or family-like bonds.").  At any rate, the *Glucksberg* analysis must take place to determine whether a child's right is deeply rooted in the Nation's history and tradition.

3

"The Supreme Court has admonished that we must be wary of recognizing new substantive due process rights 'lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences' of judges." *Sinclair v. City of Seattle*, 61 F.4th 674, 685 (9th Cir. 2023) (R. Nelson, J., concurring) (quoting *Glucksberg*, 521 U.S. at 720).  And the Court set out a two-step analysis we must engage in before recognizing new substantive due process rights. *Glucksberg*, 521 U.S. at 720–21.

Since *Glucksberg*, this court has shirked its duty. Rightly or wrongly, we continue to recognize two constitutional rights without doing the analysis required by the Supreme Court and without any clear Supreme Court authority undergirding our decisions. We may not create a new substantive due process right implicitly. And after *Glucksberg*, we must revisit these precedents.

V

Constitutional violations do not rise and fall on a fraction of a second. And Officer McBride's objectively reasonable use of force to stop the clear threat that Hernandez posed to her and others' safety does not violate the Fourth Amendment. Even if it did, as Judge Collins explains, Officer McBride is entitled to qualified immunity. And I would also affirm the district court's dismissal of the state-law claims. I agree with the majority, however, to affirm the dismissal of the Fourteenth Amendment claims.

COLLINS, Circuit Judge, with whom R. NELSON, BADE, BRESS, and BUMATAY, Circuit Judges, join as to Part II(B), concurring in part, concurring in the judgment in part, and dissenting in part:

These consolidated actions under 42 U.S.C. § 1983 arise from the shooting death of Daniel Hernandez during a confrontation with officers of the Los Angeles Police Department ("LAPD") on April 22, 2020.[1]  Plaintiffs-Appellants, who are the Estate, parents, and minor daughter of Hernandez, asserted a variety of federal and state law claims against the City of Los Angeles ("City"), the LAPD, and the officer who shot Hernandez, Toni McBride.  The district court granted summary judgment to Defendants on all claims, and Plaintiffs have appealed.  I concur in the judgment to the extent that the majority concludes that (1) the district court erred in holding that no rational jury could find that the final volley of shots fired by McBride was unreasonable under Fourth Amendment standards; and (2) the district court erred in granting summary judgment on that basis as to certain of Plaintiffs' state law claims.  I concur in Part IV(B) of the majority's opinion to the extent that it adopts the panel opinion's discussion affirming the dismissal of Plaintiffs' claim of municipal liability under § 1983 and Plaintiffs' claims under the Fourteenth Amendment.  But I dissent from the majority's conclusions

---

[1] I was the author of the panel decision in this case, *see Estate of Hernandez v. City of Los Angeles*, 96 F.4th 1209 (9th Cir. 2024), and I adhere to the views expressed in that opinion in all respects. Accordingly, in this partial dissent from the en banc court's reconsideration of the case, I will borrow liberally (and often verbatim) from that panel decision, and I will do so without the cumbersome use of quotation marks and without providing citations to my prior panel opinion.

that McBride's final volley of shots violated clearly established law and that McBride therefore is not entitled to qualified immunity with respect to Plaintiffs' Fourth Amendment excessive force claim.  Accordingly, I concur in part, concur in the judgment in part, and dissent in part.

# I

## A

During the late afternoon of April 22, 2020, uniformed officers Toni McBride and Shuhei Fuchigami came upon a multi-vehicle accident at the intersection of San Pedro Street and East 32nd Street in Los Angeles.  They decided to stop and investigate the situation.  Video footage from the patrol car and from McBride's body camera captured much of what then transpired.[2]

As the officers arrived near the intersection, they observed multiple seriously damaged vehicles, some with people still inside, and at least two dozen people gathered at the sides of the road.  As the officers exited their patrol car, the car's police radio stated that the "suspect's vehicle" was "black" and that the suspect was a "male armed with a knife."  A bystander immediately told the officers about someone trying to "hurt himself," and Fuchigami stated loudly, "Where is he?  Where's he at?"  In response, several bystanders pointed to a black pickup truck with a heavily damaged front end that was facing in the wrong direction

---

[2] Because no party contends that these video recordings were "doctored" or "altered," or that they lack foundation, this court must "view[] the facts in the light depicted by the videotape."  *See Scott v. Harris*, 550 U.S. 372, 378, 380–81 (2007).  However, to the extent that a fact is not clearly established by the videos, this court must view the evidence "in the light most favorable to the nonmoving part[ies]," *i.e.*, Plaintiffs. *Id*. at 380.

near two parked vehicles on the southbound side of San Pedro Street.  The officers instructed the crowd to get back, and McBride drew her weapon.  One nearby driver, who was sitting in her stopped sedan, told McBride through her open car window that "he has a knife."  McBride asked her, "Why does he want to hurt himself?" and the bystander responded, "We don't know.  He's the one who caused the accident."  McBride instructed that bystander to exit her car and go to the sidewalk, which she promptly did.  McBride then shouted to the bystanders in both English and Spanish that they needed to get away.  At the same time, the police radio announced that the suspect was "cutting himself" and was "inside his vehicle."  McBride then asked her partner, "Do we have less lethal?"  Referencing the smashed pickup truck, McBride said, "Is there anybody in there?"  She then stated, "Hey, partner, he might be running."

As McBride faced the passenger side of the truck, which was down the street, she then saw someone climb out of the driver's side window.  McBride yelled out, "Hey man, let me see your hands.  Let me see your hands man," while a bystander yelled, "He's coming out!"  Daniel Hernandez then emerged shirtless from behind the smashed black pickup truck, holding a weapon in his right hand.  As he did so, Officer McBride held her left hand out towards Hernandez and shouted, "Stay right there!"  Hernandez nonetheless advanced towards McBride in the street, and he continued to do so as McBride yelled three times, "Drop the knife!"  While Hernandez was coming towards her, McBride backed up several steps, until she was standing in front of the patrol car.

Hernandez began yelling as he continued approaching McBride,[3] and he raised his arms out by his sides to about a 45-degree angle.  McBride again shouted, "Drop it!"  As Hernandez continued yelling and advancing with his arms out at a 45-degree angle, Officer McBride fired an initial volley of two shots, causing Hernandez to fall to the ground on his right side, with the weapon still in his right hand.  At the point that McBride fired at Hernandez, he was between 41–44 feet away from her.

Still shouting, Hernandez rolled over and leaned his weight on his hands, which were pressed against the pavement.  He began pushing himself up, and he managed to get his knees off the pavement.  As Hernandez started shifting his weight to his feet to stand up, McBride again yelled "Drop it!" and fired a second volley of two shots, causing Hernandez to fall on his back with his legs bent in the air, pointing away from McBride.[4]  Hernandez

---

[3] Apparently relying on a bystander's declaration, the majority insists that Hernandez "did not say anything," *see* Opin. at 11, but this contention is blatantly contradicted by the relevant video evidence and should not be adopted "for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.  The same declarant also stated that he "was standing 5 feet from Mr. Hernandez" and that "[a]fter the 2nd shot was fired by the officer, Mr. Hernandez dropped the boxcutter." (As noted below, *see infra* at 56, Hernandez's weapon turned out to be a double-bladed box cutter rather than a knife.)  These assertions are also blatantly contradicted by the video evidence, which shows no one standing within 20 feet of Hernandez and that he still had the box cutter in his hand after the shooting stopped. *See infra* at 56 & n.6.

[4] In describing this portion of the video, the majority states that Hernandez "curl[ed] up into a ball with his knees against his chest and his arms wrapped around them" and that he was "balled up in a fetal position." *See* Opin. at 12, 20.  This is grossly inaccurate—at this point,

immediately began to roll over onto his left side, such that his back was momentarily facing McBride, and at that point, McBride fired a fifth shot. Hernandez then continued to roll over, and he pressed his bent left elbow and left knee against the ground, so that his chest was off the ground but facing down. But Hernandez started to collapse to the ground, and just as he did so, McBride fired a sixth shot.[5] Hernandez then lay still, face-down on the street, as McBride and other officers approached him with their pistols drawn. McBride's body camera clearly shows that the weapon was still in Hernandez's right hand as an officer approached and took it out of his hand.[6] The weapon turned out not to be a knife, but a box cutter with two short blades at the end. Starting from the point at which Hernandez came out from behind the truck until he collapsed on the ground, the entire confrontation lasted no more than 20 seconds. All six shots were fired within eight seconds.

Hernandez died from his injuries. A forensic pathologist retained by Plaintiffs opined that McBride's sixth shot—which the pathologist concluded "more likely than not" struck Hernandez in the top of his head before ultimately lodging inside the tissues in his neck—caused "[t]he immediately fatal wound in [Hernandez's] death." The

---

Hernandez's body was moving and rolling the entire time; his arms were only momentarily near his legs (not "wrapped around them"); and the majority's insinuation that Hernandez thereafter remained in a balled-up, arms-wrapped fetal position is simply untrue.

[5] The majority wrongly elides the fact that Hernandez managed to roll over and get a knee and arm on the ground before collapsing as the sixth shot was fired. *See infra* at 70.

[6] M.L.H.'s assertion that Hernandez was unarmed during the latter part of the incident is thus "blatantly contradicted" by the relevant video recording. *Scott*, 550 U.S. at 380–81.

pathologist further concluded that "[t]he next most serious wound was the wound to [Hernandez's] right shoulder that involved the lung and liver," which he opined was "more likely than not" inflicted by McBride's fourth shot. However, he stated that the shoulder wound "would not . . . have produced immediate death" and that "[w]ith immediate expert treatment, this wound alone may have been survivable."  In Defendants' response to Plaintiffs' oppositions to summary judgment, Defendants did not raise evidentiary objections to the forensic pathologist's report, nor did they provide any basis for rejecting its conclusions as a matter of law.

## B

In May and June of 2020, Hernandez's parents (Manuel and Maria Hernandez) and his minor daughter (M.L.H.) (collectively, "Plaintiffs") filed separate § 1983 actions alleging constitutional violations in connection with the shooting death of Hernandez.  Shortly thereafter, the district court formally consolidated the two cases for all purposes, and Plaintiffs filed a consolidated complaint against the City, LAPD, and McBride (collectively, "Defendants").  The operative consolidated complaint alleged three federal claims that remain at issue in this appeal: (1) a Fourth Amendment excessive force claim brought against McBride by Plaintiffs, acting on behalf of Hernandez's Estate; (2) a Fourteenth Amendment claim for interference with familial relations brought by Plaintiffs on their own behalf against all Defendants; and (3) a claim under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), by Plaintiffs, on behalf of the Estate and themselves, against the City and LAPD.  The complaint also asserted pendent state law claims for, *inter alia*, assault, wrongful death, and violation of the Bane Act (California Civil Code § 52.1).

In August 2021, the district court granted Defendants' motion for summary judgment on all claims. The court held that, as a matter of law, McBride did not use excessive force in violation of the Fourth Amendment but that, even if she did, she was entitled to qualified immunity. The court also held that McBride's actions did not "shock the conscience" and that the Fourteenth Amendment claim therefore lacked merit as a matter of law. The court concluded that the *Monell* claim failed both because there was no underlying constitutional violation and because, even if there were such a violation, Plaintiffs had not established any basis for holding the City and LAPD liable. Finally, the court held that, because all parties agreed that the remaining state law claims for assault, wrongful death, and violation of the Bane Act "r[o]se and f[e]ll based on the reasonableness of Office[r] McBride's use of force," summary judgment was warranted on these claims as well.

## II

I first address Plaintiffs' claim, asserted on behalf of Hernandez's Estate, that McBride used excessive force in violation of the Fourth Amendment.

## A

A police officer's application of deadly force to restrain a subject's movements "is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *see Kisela v. Hughes*, 584 U.S. 100, 103–07 (2018) (applying Fourth Amendment standards to a police shooting of a suspect confronting another person with a knife). Accordingly, any such use of deadly force must be "objectively reasonable." *Graham v. O'Connor*, 490 U.S. 386, 397 (1989).

In evaluating whether a particular use of force against a person is objectively reasonable under the Fourth Amendment, "the trier of fact should consider all relevant circumstances," including, as applicable, "the following illustrative but non-exhaustive factors: 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Demarest v. City of Vallejo*, 44 F.4th 1209, 1225 (9th Cir. 2022) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). The overall assessment of these competing factors must be undertaken with two key principles in mind. First, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela*, 584 U.S. at 103 (citation omitted). Second, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. (citation omitted).

I first consider whether, under these standards, McBride "acted reasonably in using deadly force" at all. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014). I agree with the unanimous judgment of the en banc court, and of the three-judge panel, that the district court correctly held, based on the undisputed facts, that McBride's initial decision to fire her weapon at Hernandez was reasonable as a matter of law.

The "most important" consideration in assessing the reasonableness of using deadly force is "whether the suspect

posed an 'immediate threat to the safety of the officers or others,'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (citations omitted), and here the undisputed facts establish that the "threat reasonably perceived by the officer," *Demarest*, 44 F.4th at 1225 (citation omitted), was substantial and imminent.  At the time that McBride fired her first shot, Hernandez had ignored her instruction to "Stay right there!" and instead advanced towards her while holding a weapon that McBride had been told repeatedly was a knife. He did so while extending his arms out and yelling in McBride's direction, and, as he continued approaching her, he ignored four separate commands to drop the knife.  Under these circumstances, use of deadly force to eliminate the objectively apparent threat that Hernandez imminently posed was reasonable as a matter of law.  *See Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) ("[T]hreatening an officer with a weapon does justify the use of deadly force."); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) ("[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force.").    While Plaintiffs emphasize that Hernandez was still approximately 40 feet away from McBride when she fired, "[t]here is no rule that officers must wait until a [knife-wielding] suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force."   *Reich v. City of Elizabethtown*, 945 F.3d 968, 982 (6th Cir. 2019) (holding that shooting of approaching knife-wielding suspect within six feet was reasonable and that even shooting a knife-wielding suspect 36 feet away would not violate clearly established law).

I also conclude, however, that the evidence in this case would permit a reasonable trier of fact to find that McBride

fired three temporally distinct volleys of two shots each. *See supra* at 55–56. Indeed, there is almost a two-second pause between McBride's second and third shots, and there is about a one-second pause between her fourth and fifth shots. Accordingly, even though McBride's first volley of shots was reasonable as a matter of law, I must still consider whether she "acted unreasonably in firing a total of [six] shots." *Plumhoff*, 572 U.S. at 777. On that score, *Plumhoff* holds that, "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id*. We have cautioned, though, that "terminating a *threat* doesn't necessarily mean terminating [a] *suspect*." *Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (emphasis added). Thus, if an initial volley of shots has succeeded in disabling the suspect and placing him "in a position where he could [not] easily harm anyone or flee," a "reasonable officer would reassess the situation rather than continue shooting." *Id*.

Applying these principles to this case, I again agree with the unanimous judgment of my colleagues on the en banc court and the three-judge panel that the undisputed evidence confirms that, at the time McBride fired the second volley of shots, the "threat" that Hernandez posed had not yet "ended." *Plumhoff*, 572 U.S. at 777. Despite falling down after having been hit by two bullets, Hernandez immediately rolled over, pressed his hands against the ground, and began shifting his weight to his feet in order to stand up. All the while, he continued shouting, and he still held his weapon in his hand despite yet another instruction by McBride to drop it. I therefore agree that McBride's third and fourth shots were reasonable as a matter of law.

However, McBride's final volley of shots—*i.e.*, shots five and six—present a much closer question. Immediately after the fourth shot, Hernandez was lying on his back with his legs in the air, pointing away from where McBride was. Hernandez then rolled over onto his left side such that his back was towards McBride. He was in that position—facing away from McBride and still lying on his side on the ground—when McBride fired her fifth shot. Although Hernandez was still moving at the time of that shot, he had not yet shown that he was in any position to get back up. Hernandez then continued to roll over, so that he was again facing McBride. As Hernandez, while still down on the ground, first appeared to shift his weight onto his left elbow, McBride fired her sixth shot. Under these circumstances, a reasonable trier of fact could find that, at the time McBride fired these two additional shots, the demonstrated threat from Hernandez—who was still on the ground—had sufficiently been halted to warrant "reassess[ing] the situation rather than continu[ing] shooting." *Zion*, 874 F.3d at 1076. A reasonable jury could find that, at the time of the fifth and sixth shots, Hernandez "was no longer an immediate threat, and that [McBride] should have held [her] fire unless and until [Hernandez] showed signs of danger or flight."[7] *Id*. Alternatively, a reasonable "jury could find that

---

[7] I therefore do not rely on the majority's questionable notion that what made the third volley unreasonable was that McBride had "unnecessarily create[d] a sense of urgency." *See* Opin. at 21 n.5. I also disagree with the majority's suggestion that there is some sort of hard and fast limit on how rapidly a reasonable officer may fire her weapon in a single volley. *Id*. Any such suggestion is contrary to *Plumhoff* and *Zion*, which confirm that, if the circumstances present a sufficiently great and highly immediate danger to human life, rapidly and continuously discharging a substantial number of shots may be justified. *See Plumhoff*, 572 U.S. at

the [third] round of bullets was justified." *Id*. On this record, the reasonableness of the fifth and sixth shots was thus a question for the trier of fact, and the district court erred in granting summary judgment on that issue.[8]

## B

McBride alternatively contends that, even if a reasonable jury could find excessive force, she is nonetheless entitled to qualified immunity. I agree.

## 1

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (emphasis added)). In determining whether the applicable law is "clearly established," so as to defeat qualified immunity, the

---

777 (holding that officers reasonably fired a total of 15 shots, but that "[t]his would be a different case if [the officers] had initiated a second round of shots after an initial round had clearly incapacitated [the suspect] and had ended any threat of continued flight, or if [the suspect] had clearly given himself up"); *Zion*, 874 F.3d at 1075 (noting that the plaintiff did not challenge the officer's "initial nine-round volley").

[8] As I will explain in the next section (*i.e.*, section II(B)), I nonetheless conclude that McBride is entitled to qualified immunity. For the reasons I have stated, I agree that the legal principles discussed in *Zion* help to elucidate why McBride's fifth and sixth shots could be deemed unreasonable under Fourth Amendment standards, but *Zion* is not so squarely controlling that it can be said, on the facts of this case, to have placed the outcome of this case "beyond debate." *Kisela*, 584 U.S. at 104 (citation omitted). That higher standard must be met to defeat qualified immunity, and it is not satisfied here for the reasons I explain *infra*.

Supreme Court "has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela*, 584 U.S. at 104 (citations and internal quotation marks omitted). Thus, "it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id*. at 105. Rather, the "law at the time of the conduct" must have defined the relevant constitutional "right's contours" in a manner that is "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id*. at 104–05 (citations omitted).

This need for "[s]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 584 U.S. at 104 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (simplified)). Because "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' . . . police officers are entitled to qualified immunity unless existing precedent '*squarely governs*' the specific facts at issue." *Id.* (emphasis added) (citation omitted). The majority agrees with Plaintiffs that this court's decision in *Zion*, 874 F.3d at 1075–76, "squarely controls this case" and that McBride is therefore not entitled to qualified immunity. *See* Opin. at 24. That is wrong. An excessive force precedent cannot be said to squarely govern a case, for qualified-immunity purposes, if that precedent is "materially distinguishable" in any respect. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021). That is, only if the precedent is *materially indistinguishable* can it be said to

"squarely govern" this case in the way that *Kisela* requires. But our opinion in *Zion* makes clear, on its face, that it is materially distinguishable from this case in multiple respects.

In *Zion*, the officers were called to Zion's apartment complex after he had suffered several seizures and assaulted his mother and roommate with a knife. 874 F.3d at 1075. As the first officer (Lopez) arrived at the complex, "Zion ran at him and stabbed him in the arms." *Id*. A second arriving officer (Higgins) witnessed the stabbing and then shot at Zion nine times from about 15 feet away while Zion was running back towards the apartment complex. *Id*. After Zion fell to the ground, Higgins ran up to him and fired "nine more rounds at Zion's body from a distance of about four feet, emptying his weapon." *Id*. At that point, Zion "curl[ed] up on his side" but was "still moving." *Id*. After taking a pause and "walk[ing] in a circle," Higgins then took "a running start and stomp[ed] on Zion's head three times." *Id.* "Zion died at the scene." *Id*. On appeal from a grant of summary judgment to the defendants, the plaintiff (Zion's mother) did not challenge the "initial nine-round volley," and instead only "challenge[d] the second volley (fired at close range while Zion was lying on the ground) and the head-stomping." *Id*.

*Zion*, like this case, thus involved an initial reasonable use of deadly force against a knife-wielding suspect, followed almost immediately by a further use of deadly force that was challenged by the plaintiffs as excessive. *See* 874 F.3d at 1075. *Zion* acknowledged the Supreme Court's general statement in *Plumhoff* that "[i]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id*. at 1076 (quoting *Plumhoff*, 572 U.S.

at 777).  But *Zion* held that this principle did not justify the second use of force by Higgins, and it explained its reasoning as follows:

> But terminating a threat doesn't necessarily mean terminating the suspect.  If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting.  *See id*. [referring to *Plumhoff*, 134 S. Ct. at 2022].  This is particularly true when the suspect wields a knife rather than a firearm.[2]  In our case, a jury could reasonably conclude that Higgins could have sufficiently protected himself and others after Zion fell by pointing his gun at Zion and pulling the trigger only if Zion attempted to flee or attack.
>
> Higgins testified that Zion was trying to get up.  But we "may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  This is especially so where there is contrary evidence.  In the video, Zion shows no signs of getting up.  Lopez Video 3:01.  This is a dispute of fact that must be resolved by a jury.

---

[2] It may be that, once on the ground, Zion had dropped the knife. Whether the knife was still in Zion's hand or within his reach, and whether Higgins thought Zion was still armed, are factual questions that only a jury can resolve.

*Zion*, 874 F.3d at 1076 & n.2.

In this discussion, *Zion* specifically noted three issues that were for the jury to resolve at trial and that therefore had to be resolved *against* the defendant for purposes of summary judgment: (1) whether "Zion was trying to get up"; (2) "[w]hether the knife was still in Zion's hand or within his reach"; and (3) "whether Higgins thought Zion was still armed." *Id.* As to each of these points, the *Zion* panel did *not* say that these issues were irrelevant to its holding; instead, it said that each of these issues was triable and had to be resolved by a jury. *Zion* therefore necessarily resolved all three issues against the defendants for purposes of summary judgment, and its excessive-force holding therefore rested on the assumption that (1) Zion was not trying to get up; (2) the knife was no longer in his hand or within his reach; and (3) Higgins knew that Zion no longer had the knife. Against *that* backdrop, *Zion* held that "[a] reasonable jury could find that Zion was no longer an immediate threat, and that Higgins should have held his fire unless and until Zion showed signs of danger or flight." 874 F.3d at 1076.

This case differs from *Zion* as to each of these three critical facts. The video evidence in this case clearly shows that, even after the fourth shot, Hernandez continuously moved in a way that gave the objective appearance of trying to get up; the video evidence shows that Hernandez never dropped his weapon and still had it in his hand at the end of the episode; and McBride's continued instructions to Hernandez to drop the knife confirm that she continued to believe that he was armed. Even if one assumes *arguendo* that *Zion* is persuasive authority that supports a finding of unreasonableness here, the case is sufficiently and materially different on its facts that it does not "'squarely govern[]' the

specific facts" of this case or place its outcome "beyond debate." *Kisela*, 584 U.S. at 104 (citations omitted).

In concluding that *Zion* nonetheless "squarely controls this case," *see* Opin. at 24, the majority ignores the specific factual context of *Zion* and instead adopts a more broadly framed reading of that case that elides several of its critical details.  In doing so, the majority directly contravenes the Supreme Court's admonition that it has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela*, 584 U.S. at 104 (citation omitted).  In particular, the majority's assertion that "it was clearly established that McBride acted unreasonably if she shot Hernandez after he was on the ground *and no longer posed an immediate threat*," *see* Opin. at 27 (emphasis added), frames the assertedly "clearly established law" at an extraordinarily "high level of generality" and thereby flagrantly defies the Supreme Court's repeated admonition.  Furthermore, the majority's overly generalized reading of *Zion* is contradicted by *Zion* itself.  Far from drawing the sort of broad, bright-line rule the majority conjures, *Zion* noted that the "boundary" line is "murky" when it comes to defining exactly when the permissible use of deadly force against a suspect who "poses an immediate threat" must be *halted* on the ground that "the suspect no longer poses a threat."  874 F.3d at 1075.  Given that *Zion* noted that the relevant line is "murky," *Zion* can hardly be said to have *clearly* established a broad general rule that places the outcome of this case beyond debate.

The majority also suggests an alternative, narrower formulation of *Zion*'s holding, but it too is flawed. Specifically, at another point in its opinion, the majority says that *Zion* "clearly established" that "an officer cannot

reasonably 'continue shooting' a criminal suspect who 'is on the ground,' 'appears wounded,' and 'shows no signs of getting up' unless the officer first 'reassess[es] the situation'—'particularly . . . when the suspect wields a knife rather than a firearm'—because the suspect 'may no longer pose a threat.'" *See* Opin. at 23 (quoting *Zion*, 874 F.3d at 1076). As an initial matter, McBride is entitled to qualified immunity under this formulation, because it cannot be said that Hernandez "show[ed] *no* signs of getting up." *Zion*, 874 F.3d at 1076 (emphasis added). Even if Hernandez had not yet demonstrated that he might actually *succeed* in getting up, his continued movements clearly gave the objective appearance of "*trying* to get up," which materially distinguishes this case from *Zion*. *See id.* (emphasis added).

The majority also ignores the clear sense in which *Zion* referred to the suspect there as being "on the ground" and "appear[ing] wounded." 874 F.3d at 1076. In asserting that a suspect who "is on the ground and appears wounded . . . *may* no longer pose a threat," *id*. (emphasis added), *Zion* cited *Plumhoff*, 134 S. Ct. at 2022 (subsequently paginated as 572 U.S. at 777–78), and in the relevant passage on the cited page, *Plumhoff* states that "[t]his would be a different case if [the officers] had initiated a second round of shots after an initial round *had clearly incapacitated [the suspect]* and had ended any threat of continued flight, or if [the suspect] had clearly given himself up." 572 U.S. at 777 (emphasis added). *Zion* thus did not suggest that *any* suspect who literally is "on the ground" and "appears wounded" is automatically no longer a threat; rather, *Zion* was referring to a suspect who has been "clearly incapacitated" by being brought to the ground by the prior shots and by then remaining down.

Here, however, Hernandez was dynamically moving the entire time—indeed, between the fifth and sixth shots, he succeeded in rolling over and objectively appeared to shift his weight onto his left elbow.  The majority speculates that his movements may have been "convulsive" rather than "intentional," *i.e.*, that they were perhaps due to "pain from four gunshot wounds" rather than to an actual effort to get back up.  *See* Opin. at 25 & n.6.  But that conjecture about Hernandez's subjective intent is irrelevant.  "'[T]he qualified immunity analysis . . . is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct in question,' and so [Hernandez's] subjective intentions are not relevant except to the extent that they were communicated to the officers."  *Spencer v. Pew*, 117 F.4th 1130, 1139 (9th Cir. 2024) (quoting *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017) (internal quotation marks omitted)).  Indeed, *Zion* itself says that what matters on this score is whether, objectively, the person "show[ed] . . . *signs of getting up*."  *Zion*, 874 F.3d at 1076 (emphasis added).  Hernandez's behavior indisputably gave the objective impression of continuous movement and "show[ed] . . . signs of getting up," *id*., and that materially distinguishes this case from *Zion*.  It takes an *extension* of the principles in *Zion* to rule for Plaintiffs in this case; *Zion* itself does not "squarely govern" here in the sense that *Kisela* requires— which is that every reasonable officer would know, based on *Zion*, that the last two shots could not lawfully be fired here.

The majority's alternative formulation of *Zion*'s holding also remains overbroad in that it again elides the fact that in this case, unlike in *Zion*, there are no triable issues as to (1) whether the bladed weapon "was still in [the suspect's] hand"; and (2) whether the officer "thought [the suspect] was still armed."  874 F.3d at 1076 n.2.  As I have explained,

the video evidence in this case indisputably confirms that Hernandez never dropped his weapon, and, in addition, it is undisputed that McBride knew that Hernandez had not dropped the weapon.  By again disregarding these critical details, the majority errs in wrongly framing *Zion*'s holding at a "high[er] level of generality" that treats these points as irrelevant to that holding.  *Kisela*, 584 U.S. at 104 (citation omitted).  Had the *Zion* panel held that these points raised by the defendants were irrelevant, it could have said so. Instead, it held that they raised disputed factual issues for the jury to ultimately weigh in assessing, at trial, whether or not the force was unreasonable.

The majority's response on this particular point is as startling as it is wrong.  According to the majority, the scope of the clearly established rule that emerges from *Zion* must be framed, not based on what our opinion in *Zion* actually *said* about the facts of that case, but rather based on what the *court files* of that case reveal to be the "true" facts of the case.  Thus, while our opinion in *Zion* squarely held that there was a "factual question[] that only a jury can resolve" as to whether "the knife was still in Zion's hand or within his reach" and as to whether the officer thought he "was still armed," 874 F.3d at 1076 n.2, the majority instead dismisses that comment in *Zion* as "unsupported" "speculat[ion]" for which "there was no evidence" in the record.  *See* Opin. at 25–26.  That is true, according to the majority, based on (1) a concession made in a footnote in the *Zion* plaintiff's opening brief and (2) a comment made at the oral argument in *Zion* by "the judge who authored the opinion."  *See* Opin. at 25 n.7.  But whether *Zion* or any other precedent "squarely governs" a particular case for qualified-immunity purposes, *see Kisela*, 584 U.S. at 104, turns on how *Zion* itself described and understood its own facts, and not on how a

later court, based on its own independent review of the earlier record, thinks the facts of the precedent *should* have been described. *See*, *e.g.*, *Rivas-Villegas*, 595 U.S. at 6–7 (relying entirely on the relevant circuit precedent's description of its own facts).

Moreover, after improperly rummaging through the *Zion* record in an effort to contradict our opinion's description of the facts in that case, the majority then improperly truncates a quotation from *Zion* so as to suggest that, far from acknowledging a triable issue as to whether Zion still held the knife, our opinion affirmatively "assumed for discussion purposes that 'the suspect *wields* a knife' and might still 'attempt[] to . . . attack' the officer." *See* Opin. at 25–26 (emphasis added by majority). But by referencing the fact that Zion "wield[ed] a knife," our point in *Zion* was not—as the majority wrongly insinuates—that Zion *never dropped* the knife, but rather that he "wield[ed] a knife *rather than a firearm*," which of course would have been substantially more dangerous. *Id*. at 1076 (emphasis added). By wrongly editing out the latter italicized phrase in this instance, the majority recasts *Zion* in a way that removes its weapon-comparing point and thereby improperly alters the opinion's clear meaning. In fact, immediately after making this (mis)quoted comment contrasting knives and firearms, the *Zion* court dropped a footnote expressly acknowledging that there *was* a triable issue as to whether Zion dropped the knife that he wielded. 874 F.3d at 1076 & n.2.

What follows from all this is quite troubling. Under the majority's opinion, reasonable officers apparently no longer can rely on what our opinions actually say; now, they must delve into the court records to see whether our precedents described their own facts incorrectly, and officers must also consider that future panels may take considerable liberties

with selectively quoting the opinion's language.  The majority's openly revisionist approach to *Zion* is flatly contrary to settled qualified-immunity doctrine, the "focus" of which is whether the language of the controlling precedent provided "*fair notice*" to the defendant "that her conduct was unlawful."  *Kisela*, 584 U.S. at 104 (emphasis added) (citation omitted).

Because *Zion* does not "clearly dictate" that McBride's use of force was unreasonable here, *Mullenix*, 577 U.S. at 17, it does not "squarely govern[]" this case, *Kisela*, 584 U.S. at 104 (citation omitted).  Absent some other showing that then-existing precedent made clear to every reasonable officer that McBride's use of force was unreasonable, she is entitled to qualified immunity.  As explained in the next section, no such showing has been made.

**2**

Although the majority relies only on *Zion*, Plaintiffs invoke several other precedents, but none of them can be said to squarely govern this case.

For example, Plaintiffs also rely on *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001), but the Supreme Court "has already instructed the Court of Appeals not to read its decision in that case too broadly in deciding whether a new set of facts is governed by clearly established law."  *Kisela*, 584 U.S. at 106.  The Court's summary of *Deorle* in *Kisela* equally confirms why it does not squarely govern the facts of this case: "*Deorle* involved a police officer who shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been 'physically compliant and generally followed all the officers' instructions'; and he had been under police observation for roughly 40 minutes."  *Id*.

at 106–07 (citing *Deorle*, 272 F.3d at 1276, 1281–82). Nearly all of these key factual premises underlying *Deorle*'s holding are missing in this case.

The other Ninth Circuit cases on which Plaintiffs rely are even more strikingly distinguishable from this case. Indeed, in addition to other significant differences, none of the cited cases even involves a situation (such as this one or *Zion*) in which the use of deadly force initially *was* reasonable. *See Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019) (holding that the officer's shooting of a suspect who was reported to have earlier threatened someone with a knife was unreasonable under clearly established law where a jury could find that the officer "responded to a misdemeanor call, pulled his car into a well-lit alley with his high beam headlights shining into [the suspect's] face, never identified himself as a police officer, gave no commands or warnings, and then shot [the suspect] within a matter of seconds, even though [the suspect] was unarmed, had not said anything, was not threatening anyone, and posed little to no danger to [the officer] or anyone else"); *Hayes*, 736 F.3d at 1234–35 (holding that immediate shooting of suicidal man who revealed a knife, without ordering him to stop or drop the knife, was unreasonable).

I acknowledge that, even when, as here, there is no relevant "[p]recedent involving similar facts" that "can help move a case beyond the otherwise 'hazy border between excessive and acceptable force,'" generally framed rules can still "create clearly established law" in "an 'obvious case.'" *Kisela*, 584 U.S. at 105 (citations omitted). But to meet that high standard, Plaintiffs would have to show that "*any* reasonable official in the defendant's shoes would have understood that he was violating" the Constitution. *Id.* (quoting *Plumhoff*, 572 U.S. at 778–79 (emphasis added)).

That demanding standard reflects the long-standing principle that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (citation omitted). Plaintiffs have not satisfied that standard here. Even if one assumes *arguendo* that McBride's fifth and sixth shots were unreasonable, this is not an obvious situation in which *every* reasonable officer would have understood that the law forbade firing additional shots at the already wounded Hernandez as he plainly appeared to continue to try to get up.

Because McBride did not violate clearly established law in firing her third volley of shots, she is entitled to qualified immunity. On that basis, I would affirm the grant of summary judgment to McBride on Plaintiffs' Fourth Amendment excessive force claim.

### III

With respect to Plaintiffs' challenge to the district court's dismissal of their Fourteenth Amendment claim against all Defendants and their *Monell* claim against the City and LAPD, the majority adopts the analysis in the three-judge panel's opinion in this case. As the author of that panel opinion, I concur in the majority opinion with respect to these points.

I concur in the judgment to the extent that the majority concludes that the district court erred in dismissing Plaintiffs' state-law claims for (1) assault, (2) wrongful death, and (3) violation of California Civil Code § 52.1. The district court's sole reason for granting summary judgment to Defendants on these claims was its "determin[ation] that Officer McBride's use of force was reasonable." Because I agree that the reasonableness of McBride's final volley of

shots presents a question for a trier of fact, the district court erred in dismissing these state law claims on that ground. I therefore concur in the reversal of the district court's dismissal of these claims.

## IV

For the foregoing reasons, I dissent from the majority's reversal of the district court's grant of summary judgment as to Plaintiffs' Fourth Amendment excessive force claim against McBride. I concur in the majority opinion to the extent that it rejects all of Plaintiffs' remaining federal claims, and I concur in the judgment reversing the district court's summary judgment with respect to Plaintiffs' state law claims for assault, wrongful death, and violation of the Bane Act (Cal. Civ. Code § 52.1).

BUMATAY, Circuit Judge, dissenting in part:

Our court is wrong here—dangerously wrong.  This should have been a straightforward case.  Daniel Hernandez charged an officer with a blade, ignored warnings to stop, and closed within a few dozen feet of the officer.  The officer began shooting.  In the end, the officer shot six times in six seconds.  The officer had no reasonable opportunity to ensure her safety or the safety of the many civilians surrounding Hernandez in that short time.  Under the totality of the circumstances, the officer didn't use excessive force in stopping an obvious threat.  *See Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (officers are justified in using deadly force until the defendant is "clearly incapacitated" or has "ended any threat of continued flight").

The majority denies qualified immunity by adopting an extreme version of the moment-of-threat rule.  Under the majority's telling, we are to ignore everything except the literal last fractions of a second of a police interaction.  The majority divides the six seconds between the officer's first and last shots into three distinct "volleys" and measures the intervals between them down to the millisecond.  It then faults the officer for failing to reassess the situation in those final milliseconds.  But the Constitution doesn't require this radical parsing of events.  The touchstone of the Fourth Amendment is reasonableness.  It doesn't require the superhuman discipline that the majority demands.

As Judge Nelson aptly points out, judges review police shootings only in hindsight.  We review police tapes years after the fact.  We get to rewind, pause, fast forward— analyzing the situation frame-by-frame.  While the advent of police bodycam videos has been a welcome change, we can't ignore that real life isn't in slow motion.

The Supreme Court's recent decision in *Barnes v. Felix*, No. 23-1239, 2025 WL 1401083 (U.S. May 15, 2025), shows the error of our decision.  There, the Court rejected the very practice of analyzing use of deadly force cases down to the "precise millisecond when an officer deploys force." *Id.* at *3 (simplified).  Such a practice improperly "narrow[s] the totality-of-the-circumstances inquiry, to focus only on a single moment." *Id.* at *5.  So rather than considering a case with "chronological blinders," courts must look to the entire exchange. *Id.*  Here, our court puts on those blinders to ignore everything except the last 1.4 seconds of the interaction.

I join Judge Nelson's dissent in full.  I write separately to note that the majority bases its decision on *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017).  In *Zion*, this court started the practice of analyzing police encounters down to milliseconds. *Id.* at 1075–76.  Though distinguishable from this case, we should have taken this opportunity to overrule *Zion*.

I respectfully dissent.